IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11 B 48903 |
| | ) | |
| CLARE OAKS, | ) | Hon. Pamela S. Hollis |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## FINAL ORDER REGARDING USE OF
## CASH COLLATERAL AND ADEQUATE PROTECTION

This Final Order Regarding Use of Cash Collateral and Adequate Protection (this "Final Order") is entered upon the Debtor's Emergency Motion for the Entry of an Interim Order: (I) Authorizing Use of Cash Collateral; (II) Providing Adequate Protection; and (III) Scheduling a Final Hearing [Dkt. No. 17] (the "Motion")[1] and upon terms agreed to on a final basis by and between Clare Oaks (the "Debtor"), Wells Fargo Bank, National Association, as Master Trustee (as described more fully herein, the "Master Trustee") and as Bond Trustee (as described more fully herein, the "Bond Trustee"; collectively with the Master Trustee, the "Trustee"), for those certain Illinois Finance Authority Revenue Bonds (Clare Oaks Project) (as described more fully herein, the "Series 2006 Bonds"), and Sovereign Bank, as issuer of certain letters of credit and holder of certain of those same Series 2006 Bonds (the "Bank").

Upon the terms of the Motion, the stipulation, acknowledgement and agreement of the Debtor, the Trustee and the Bank, it appears to the Court that:

A.      On December 5, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and thereby commenced a case thereunder (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Motion.

Code.  No request has been made for the appointment of a trustee or examiner.  An official committee of unsecured creditors was appointed on December 19, 2011.

B.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Due and appropriate notice of the Motion, the relief requested therein and the hearing having been served by the Debtor on: (i) the Office of the United States Trustee for the Northern District of Illinois; (ii) the Debtor's 20 largest unsecured creditors on a consolidated basis; (iii) counsel to the proposed DIP Lender (as defined herein); (iv) counsel to Wells Fargo Bank, National Association, as master trustee under that certain Master Trust Indenture dated as of July 1, 2006 and as mortgagee under the Leasehold Mortgage and Security Agreement dated as of July 1, 2006 with respect to certain bonds  issued for the benefit of the Debtor by the Illinois Finance Authority pursuant to two separate Bond Trust Indentures between the Authority and Wells Fargo Bank, National Association, as Bond Trustee, each dated as of July 1, 2006, (v) counsel to Sovereign Bank, (vi) counsel to The Sisters of St. Joseph  of the Third Order of St. Francis, Inc. and (vii) any other known lien holder as of the Petition Date who has an interest in the cash collateral in compliance with Bankruptcy Rule 4001(b) and the Local Bankruptcy Rules.

### The Debtor and the Bonds

D.    The Debtor is the sole member of an obligated group (the "Obligated Group") created by the Master Trust Indenture dated as of July 1, 2006, as supplemented and amended by the First Supplemental Master Trust Indenture dated as of July 1, 2008, the Second Supplemental Master Trust Indenture dated as of May 1, 2010, and the Third Supplemental Master Trust Indenture dated as of October 1, 2010 (as supplemented and amended, the "Master Indenture"), between the Debtor and the Master Trustee.

2

E.    The Debtor has issued certain direct note obligations (the "Bond Obligations") under the Master Indenture to secure the Series 2006 Bonds issued by the Illinois Finance Authority (the "Authority") in the original aggregate principal amount of $112,725,000 pursuant to two separate Bond Trust Indentures, each dated as of July 1, 2006 (collectively, the "Bond Indentures"), each between the Authority and the Bond Trustee. The Authority loaned the proceeds of the Series 2006 Bonds to the Debtor (such loans, the "Prepetition Loans") pursuant to two separate Loan Agreements, each dated as of July 1, 2006 (collectively, the "Loan Agreements"), between the Authority and the Debtor. As security for the Series 2006 Bonds, the Authority has assigned and pledged to the Bond Trustee the related Bond Obligations and payments to be made by the Obligated Group thereon, and certain rights of the Authority under the Loan Agreements and payments to be made by the Debtor thereunder. As additional security, the Debtor has granted to the Master Trustee a lien on the Debtor's leasehold estate and security interest in certain personal property of the Debtor pursuant to the Leasehold Mortgage and Security Agreement dated as of July 1, 2006 (the "Mortgage"), between the Debtor and the Master Trustee. The Clare Oaks Campus is located on real estate leased to the Debtor by the Sisters of St. Joseph of the Third Order of St. Francis, Inc. (the "Landlord"), pursuant to the Ground Lease dated July 1, 2006 (the "Ground Lease"), between the Landlord, as landlord, and the Debtor, as tenant.

F.    The Series 2006C Bonds and the Series 2006D Bonds are also supported by two separate letters of credit, respectively (the "Letters of Credit"), issued by Bank pursuant to the Letter of Credit Agreement dated as of July 1, 2006, as amended by the First Amendment to Letter of Credit Agreement and Waiver dated as of December 1, 2008, and the Second Amendment to Letter of Credit Agreement dated as of October 1, 2008 (as amended, the "L/C Agreement"), between the Bank and the Debtor. MB Financial Bank ("MB Financial") is a participant in certain of the rights and obligations of the Bank under the L/C Agreement. The

3

Debtor has issued certain direct obligations under the Master Indenture as security for the Debtor's reimbursement obligations to the Bank arising under the L/C Agreement for drawings under the Letters of Credit and fees relating to the Letters of Credit.

G.     The Debtor has also issued certain direct note obligations under the Master Indenture to secure its obligations (the "Swap Obligations") under two interest rate swaps related to the Series 2006C Bonds and the Series 2006D Bonds entered into by the Debtor with Sovereign Bank (the "Swap Provider").

H.     The Debtor, as sole member of the Obligated Group is liable for the Prepetition Loans, plus accrued but unpaid interest, fees, costs and expenses incurred by the Bank and MB Financial pursuant to the L/C Agreement and accrued and unpaid Swap Obligations, which, together with the accrued and unpaid expenses of the Master Trustee and the Bond Trustee, is defined as the "Prepetition Indebtedness."

I.     To secure repayment of the Prepetition Indebtedness, the Debtor granted to the Master Trustee, pursuant to the Mortgage and the Master Indenture, a mortgage lien on and security interest in the leased premises under the Ground Lease  (the "Leased Premises"), a security interest in the personal property of the Debtor located on the Leased Premises, and a security interest in all receipts, revenues, rentals, income, insurance proceeds and other moneys derived from the ownership and operation of the CCRC, whether in the form of accounts, general intangibles and other rights, whether now existing or hereafter acquired (all of the foregoing assets generally described above, the "Prepetition Collateral," and such mortgage, liens and security interests, the "Prepetition Liens").   For the avoidance of doubt, the Prepetition Collateral does not include the fee interest in the Land Premises or Existing Improvements (as those terms are defined in the DIP Loan Agreement).  As used herein, the term "Bond Documents" refers to the Series 2006 Bonds, the L/C Agreement, the Master Trust Indenture, the Bond Indentures, the Loan Agreements and each other agreement,

4

document or instrument granting a Prepetition Lien, evidencing any Prepetition Indebtedness or otherwise executed in connection with the Prepetition Indebtedness or the Prepetition Collateral.

J.     A portion of the initial proceeds of the Series 2006 Bonds was used to create debt service reserve funds and other funds pursuant to the terms of the Master Indenture and the Bond Indentures (all accounts and/or deposits therein as of the Petition Date which are held by the Master Trustee and the Bond Trustee pursuant to the terms of the documents evidencing and/or securing the Series 2006 Bonds are hereinafter referred to as the "Trustee Held Funds"). The Debtor, for itself and its successors and assigns, stipulates, acknowledges and agrees that it has no interest in any of the Trustee Held Funds and such Trustee Held Funds are not property of the Debtor's bankruptcy estate.

K.     As of the Petition Date, the aggregate principal amount outstanding under the Series 2006 Bonds is $95,810,000 (such outstanding principal amount, the "Bond Claim").[2] The Master Trustee reserves any and all rights to amend the Bond Claim, and nothing herein shall be deemed to be a waiver of such rights; provided, however, that in the event the Master Trustee amends the Bond Claim to increase the amount thereof, the Debtor may challenge any such increased amount.

### Use of Cash Collateral and Need for Adequate Protection

L.     On December 19, 2011, the Court entered an Interim Order (1) Authorizing Use of Cash Collateral and (2) Providing Adequate Protection [Dkt. No. 62], pursuant to which the Master Trustee was granted certain adequate protection for the Debtor's use of its cash collateral on an interim basis. On December 22, 2011, the Court entered a Second Interim Order Regarding Use of Cash Collateral and Adequate Protection [Dkt. No. 72], pursuant to

---

[2] In addition to the Bond Claim, the Prepetition Indebtedness includes accrued and unpaid interest, the Swap Obligations, unpaid fees under the L/C Agreement and the costs and expenses reimbursable under the Bond Documents.

5

which the Master Trustee was granted certain adequate protection for the Debtor's continued use of its cash collateral on an interim basis.  On January 30, 2012, the Court entered a Third Interim Order Regarding Use of Cash Collateral and Adequate Protection (the "Third Interim Order"), pursuant to which the Master Trustee was granted certain adequate protection for the Debtor's continued use of its cash collateral on an interim basis.   The adequate protection granted to the Master Trustee in the Third Interim Order applies through the date of the entry of this Final Order.   Thereafter, the only adequate protection provided to the Master Trustee shall be the adequate protection granted hereunder or provided in further orders of the Court.

M.    On December 13, 2011, the Debtor filed its Motion for Interim and Final Orders (I) Authorizing Debtor, as Debtor in Possession, to Incur Postpetition Secured Indebtedness, (II) Granting Security Interests and Super-Priority Claims, (III) Modifying Automatic Stay and (IV) Setting Final Hearing [Dkt. No. 47] (the "DIP Motion"), pursuant to which the Debtor sought an interim order (as entered by the Court on December 23, 2011 [Dkt. No. 82], the "First Interim DIP Order") and a final order approving, among other things, the granting of certain first-priority liens (the "Priming Liens") to Senior Care Development, LLC (the "DIP Lender") that are senior to those of the Secured Creditors, and securing financing provided by the DIP Lender on an interim basis in a principal amount not to exceed $1,500,000 (the "Interim DIP Financing"), as provided more fully in the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of December 22, 2011 between the Debtor and the DIP Lender (as amended from time to time, including by the First Amendment (as hereinafter defined) and the Second Amendment (as hereinafter defined), the "DIP Loan Agreement").   On February 2, 2012, the Court entered a second interim order regarding the DIP Motion [Dkt. No. 144] (the "Second Interim DIP Order", and together with the Second Interim DIP Order, the "Interim DIP Orders"), approving an extension of the Interim DIP Financing, as described more fully in the First Amendment to Senior Secured

6

Super-Priority Debtor-in-Possession Loan Agreement, dated as of February 2, 2012 (the "First Amendment"). The Debtor is also seeking, in conjunction with this Final Order, a final order (the "Final DIP Order"), approving the Priming Liens and securing financing provided by the DIP Lender on a final basis in a principal amount not to exceed $6,000,000, as provided more fully in the DIP Loan Agreement, as amended by the First Amendment to DIP Loan Agreement and the Second Amendment to Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated on or about March 6, 2012 (the "Second Amendment") (the "DIP Financing").

N.      The Master Trustee, the Bond Trustee and the Bank (collectively, the "Secured Creditors") do not consent to the use of cash collateral or to the terms of the Final DIP Order, including the Priming Liens granted to the DIP Lender under the Interim DIP Orders and the Final DIP Order, except upon the terms and conditions of this Final Order and the Final DIP Order..

O.      Without the use of cash collateral and the DIP Financing, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations immediately or, at a minimum, would disrupt the Debtor as a going concern, would eliminate or significantly decrease the likelihood of a successful disposition of the Debtor's assets in Chapter 11, and would not be in the best interest of the Debtor, its estate or its creditors. In lieu of giving the Master Trustee relief from the automatic stay, the Debtor wishes to provide the Master Trustee the liens, security interests, and other protections set forth in this Final Order.

P.      The terms of this Final Order reflect the Debtor's exercise of business judgment consistent with its fiduciary duties. This Court concludes that entry of this Final Order is in the Debtor's best interests and that of its estate, residents and creditors.

**NOW, THEREFORE, THE COURT HEREBY ORDERS AS FOLLOWS:**

2135367-4

1.    <u>Disposition</u>.  The Motion is granted on the terms set forth in this Final Order. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are overruled on the merits.

2.    <u>Authorization to Use Cash Collateral</u>.  The Debtor is authorized to use all cash collateral (as defined in Section 363 of the Bankruptcy Code) other than (i) proceeds of any lease, sublease, license or sale outside the ordinary course of business of any of the Debtor's assets and (ii) Trustee Held Funds (all such non-excluded cash collateral, the "<u>Cash Collateral</u>") until such authority is terminated pursuant to paragraph 16; <u>provided</u>, <u>however</u>, that the Debtor shall be authorized to use Cash Collateral and expend money solely in compliance with the budget attached hereto as **Exhibit A** and incorporated herein by reference (as it may be amended from time to time as described in paragraph 5, the "<u>Budget</u>"), subject to the variances permitted by the DIP Loan Agreement.

3.    <u>Prohibited Use of Cash Collateral</u>.  Notwithstanding anything herein to the contrary (other than the limited rights of the Official Committee of Unsecured Creditors (the "<u>Committee</u>") to investigate potential claims as described in paragraph 24 hereof), no proceeds of Cash Collateral or the DIP Financing shall be used for any of the following (each, a "<u>Trustee Dispute</u>"): (i) objecting to, or contesting in any manner, or raising any defenses to, the validity, amount, extent, perfection, priority, or enforceability of the Series 2006 Bonds, the Prepetition Collateral, the Bond Claim, or any liens or security interests with respect thereto, or any other rights or interests of the Master Trustee therein, or in asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code against the Secured Creditors or any holder of the Series 2006 Bonds, including with respect to payments

8

made pursuant to the Bond Documents or the L/C Agreement; (ii) asserting any claims or defenses or causes of action against the Secured Creditors or any holders of the Series 2006 Bonds, or their respective agents, affiliates, representatives, attorneys or advisors; (iii) preventing, hindering or otherwise delaying the Master Trustee's assertion, enforcement or realization on the Prepetition Collateral or Postpetition Bond Collateral (as defined below) in accordance with the Bond Documents or this Final Order; (iv) seeking to modify or modifying any of the rights granted hereunder to any of the Secured Creditors or any holders of the Series 2006 Bonds; or (v) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Master Trustee's liens on any Prepetition Collateral; provided, however, that a Trustee Dispute shall not include (i) the prosecution of the Motion and the Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Debtor, as Debtor-in-Possession, to Incur Postpetition Secured Indebtedness, (II) Granting Security Interests and Super-Priority Claims, (III) Modifying Automatic Stay, and (IV) Setting Final Hearing, including without limitation the seeking of the Final DIP Order and this Final Order, (ii) responding to any notice of an Event of Default (as defined in the Final DIP Order) or notice of a Termination Event (as hereinafter defined) or enforcing any of the Debtor's rights under this Final Order or the Final DIP Order, including without limitation seeking, appearing at, and fully participating in an emergency hearing, and (iii) actions taken after the Termination Date (as hereinafter defined) or the closing date of a sale of all or substantially all of the Debtor's assets to wind-down the Debtor's estate to extent necessary to protect of the interests of the residents.

4.     Amendment or Extension of Order.   This Final Order shall not be amended without the express written consent of the Master Trustee and the Bank, which shall be at their

9

respective sole discretion. Notice of any such amendment to this Final Order shall be filed with the Court and served on all parties entitled to notice in accordance with Fed R. Bankr. Proc. 4001(b) and the Local Bankruptcy Rules including, but not limited to, the Committee and the DIP Lender. Any such party may object to such amendment and request a hearing before the Court. If no such objection is made within five (5) business days of such notice, such amendment to this Final Order shall become final.

5.    Amendment or Extension of Use of Cash Collateral. The Budget shall not be amended without the express written consent of the Master Trustee and the Bank, which shall be given at their respective sole but reasonable discretion. Any amendment or modification of the Budget shall not require approval by the Court to be effective. Any amendment of the Budget must also be in accordance with the Final DIP Order.

**Adequate Protection Provided to the Master Trustee**

6.    Adequate Protection Payments. The Master Trustee and the Bank shall receive, as partial adequate protection, payments in the amount provided for in the Budget for adequate protection (the "Adequate Protection Payments"). All parties reserve their respective rights with respect to the allocation of the Adequate Protection Payments.

7.    Replacement Lien. As further partial adequate protection and to the extent of the diminution in value of the Master Trustee's interests in the totality of the Prepetition Collateral, from and after the Petition Date, resulting from (i) the use of Cash Collateral by the Debtor, (ii) the subordination of the Master Trustee's liens on the Prepetition Collateral to the Carve Out (as hereinafter defined), (iii) the subordination of the Master Trustee's liens on the Prepetition Collateral to the Priming Liens, and (iv) the imposition or enforcement of the automatic stay

10

(collectively, the "Diminution in Value"), the Master Trustee shall have a valid, perfected and enforceable continuing replacement lien and security interest (the "Replacement Lien") in all assets of the Debtor existing on or after the Petition Date of the same type as the Prepetition Collateral (which, for the avoidance of doubt, does not include the fee interest in the Land Premises or Existing Improvements), together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of the Master Trustee in the Prepetition Collateral as of the Petition Date. The Replacement Lien shall be subject only to (i) the Priming Liens, (ii) the Carve-Out, (iii) (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid liens in existence at the Petition Date and that are perfected subsequent to the Petition Date and as permitted by section 546(b) of the Bankruptcy Code and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (the liens described in the preceding sub-clauses (x) and (y), the "Permitted Encumbrances") and (iv) the prior rights of residents to the Resident Deposits (as hereinafter defined).

8.      Supplemental Lien. As further partial adequate protection and to the extent of the Diminution in Value, the Master Trustee shall have as of the Petition Date a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") in all Collateral. The term "Collateral" and "Postpetition Bond Collateral" shall each mean all property and interests in property (whether tangible or intangible, real property or personal property), whether now owned or hereafter acquired by Debtor (which, for the avoidance of doubt, does not include the fee interest in the Land Premises or the Existing Improvements). The definition of Collateral and Postpetition Bond Collateral shall be deemed to include, without

11

limitation, cash and cash equivalents, rights in deposit accounts, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries of Debtor, investment property, instruments, chattel paper, real estate, leasehold interests (including Debtor's leasehold estate in the Tenant Leasehold Estate (as defined in the Lease, as defined in the DIP Loan Agreement), contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof. For the avoidance of doubt, the Collateral and Postpetition Bond Collateral shall also include (i) all resident processing fees, entrance fees, if any, deposits to reserve a unit at the campus and option deposits to secure the option of each entrant to terminate the residency agreement, without loss of the entrant's deposits, pursuant to the residency and care agreements (or other applicable agreements) and riders thereto for the continuing care retirement community in Bartlett, Illinois known as "Clare Oaks" received by Debtor after the Petition Date, plus the deposits and entrance fees in the approximate amount of $907,100 as of the Petition Date held in escrow accounts with The Chicago Trust Company, N.A., a Wintrust Wealth Management Company (whether existing or new) (collectively, the "Resident Deposits") and (ii) all other accounts of Debtor, and all proceeds and products of all of the foregoing. Notwithstanding the foregoing or any other terms of this Interim Order, Collateral shall not include (a) Trustee Held Funds and (b) claims and causes of action that arise on or subsequent to the Petition Date under Chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby, whether by judgment, settlement or otherwise. The Supplemental Lien shall be subject only to (i) the Priming Liens, (ii) the Carve-Out, (iii) the Permitted Encumbrances and (iv) the prior rights of residents to the Resident Deposits. The Replacement Lien and the Supplemental Lien (together, the "Post-

12

Petition Bond Liens") shall be in addition to all other rights of the Master Trustee, including its liens and security interests in the Prepetition Collateral

9.     <u>Superpriority Claim</u>.  As further partial adequate protection and to the extent of any Diminution in Value, the Master Trustee shall have a super-priority administrative expense claim pursuant to Bankruptcy Code Section 507(b) (the "<u>Superpriority Claims</u>") in all Collateral. Except for the Carve-Out, the superpriority claim granted to the DIP Lender under the Final DIP Order, and the prior rights of residents with respect to Resident Deposits, the Superpriority Claim shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

10.    <u>Additional Provisions Regarding Post-Petition Bond Liens</u>.  The Post-Petition Bond Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of Debtor and its estate under Section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in Bankruptcy Codes Section 507(a)(8), or (iii) subordinated to or made pari passu with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise, except to the Priming Liens.

11.    <u>No Further Action Required</u>.  The approval of this Final Order by the Court shall be sufficient and conclusive evidence of the validity, extent, enforceability and perfection of the Replacement Lien and the Supplemental Lien granted to the Master Trustee in this Final Order, whether or not the Master Trustee elects to file or record financing statements, any other documents, or to take such other steps as may otherwise be required to obtain, evidence or perfect such liens under applicable law; <u>provided</u>, <u>however</u>, upon the request of the Master Trustee, the Debtor shall execute such other documents as may be reasonably requested to evidence and perfect such liens, and the Master Trustee may, in its sole discretion, but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any jurisdiction in which the Debtor has real or personal property, and such filing or recording shall be accepted and shall constitute further evidence of perfection of their liens and security interests.  The failure of the Debtor to execute any such other documentation shall in no way affect the validity, perfection or priority of the Master Trustee's liens and security interests in the Prepetition Collateral or the Post-Petition Bond Collateral.  No obligation, payment, transfer or grant of security under this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act (or similar statue or common law) or subject to any defense reduction, setoff, recoupment or counterclaim.

12.    <u>Determination of Prepetition Liens and Bankruptcy Code Section 506(c) Waiver</u>. Except as provided in Paragraph 24 of this Final Order, the approval of this Final Order by the Court is a conclusive and binding determination on all parties of (i) the amount of the Bond Claim, and (ii) that the Master Trustee's Prepetition Liens on the Prepetition Collateral have

14

been duly perfected and are in all respects valid and enforceable first priority security interests

and liens, subject only to the Priming Liens, the rights of residents in the Resident Deposits and

the Permitted Encumbrances, and not subject to any claim under sections 506(c) and 552(b) of

the Bankruptcy Code.

13.     <u>Compliance With Bond Documents</u>.  The Debtor shall comply with the terms and

provisions of the Bond Documents as set forth on schedule 13 attached to the final order

authorizing the use of cash collateral and shall, among other requirements, require maintenance

of adequate insurance and the payment of any and all claims that could become a prior lien on

the Prepetition Collateral or the Post-Petition Collateral (other than those liens permitted

hereunder).

14.     <u>Financial Information</u>.  The Debtor shall allow the Secured Creditors reasonable

access during normal business hours to the premises, officers, employees, auditors, appraisers

and financial advisors of the Debtor in order to conduct appraisals, analyses and/or audits of the

Prepetition Collateral and the Post-Petition Bond Collateral, and shall otherwise reasonably

cooperate in providing any other financial information requested by the Secured Creditors.  In

addition, upon the reasonable request of the Secured Creditors, the Debtor and its professionals

shall participate in telephone conference calls with the Secured Creditors, and their agents,

advisors and/or representatives, along with holders of the Series 2006 Bonds that are restricted,

to discuss financial and marketing results and such other matters as are relevant or are reasonably

requested by the Secured Creditors, including the status of complying with the Sales Milestones

(as defined below).  From and after the entry of this Final Order, the Debtor shall provide to the

Secured Creditors the financial and other reporting as described in the DIP Documents (as

15

defined in the Final DIP Order) on the same dates and times as such reports are provided to the

DIP Lender.   The Debtor shall provide to the Secured Creditors such other reports and

information as may be reasonably requested from time to time by the Secured Creditors.

    15.   <u>Sale Milestones</u>.  The Debtor agrees to market and sell substantially all of their

assets, in consultation with their advisors, and to meet the following milestones (collectively, the

"<u>Sale Milestones</u>"):

    (i)   On or prior to February 6, 2012, the Debtor shall have received and notified the Master Trustee, the Bank and the Committee (subject to the Committee's execution and delivery of a confidentiality agreement acceptable to Debtor, the Master Trustee and the Bank (the "<u>Committee Confidentiality Agreement</u>")) of Debtor's receipt of a non-binding letter of intent from a potential stalking horse bidder for the purchase of all or substantially all of the Debtor's assets.

    (ii)   On or prior to April 6, 2012, the Debtor shall have received and notified the Master Trustee, the Bank and the Committee (subject to the Committee's execution and delivery of the Committee Confidentiality Agreement) of the Debtor's receipt of a binding letter of intent from a potential stalking horse bidder for the purchase of all or substantially all of the Debtor's assets.

    (iii)   Not later than April 23, 2012, the Debtor shall (x) have received and notified the Master Trustee, the Bank and the Committee (subject to the Committee's execution and delivery of the Committee Confidentiality Agreement) of the Debtor's receipt of an asset purchase agreement for the purchase of all or substantially all of Debtor's assets reasonably satisfactory to the Master Trustee and the Bank and (y) file a motion for approval of certain bid procedures and authority to sell its assets to the stalking horse bidder or such other bidder making a higher and better offer for such assets, reasonably satisfactory in form and substance to the Master Trustee and the Bank, which shall authorize the Master Trustee to credit bid the amount of the Bond Claim.

    (iv)If applicable, on or before June 4, 2012, the Debtor shall have conducted an auction for the sale of all or substantially all of the Debtor's assets.

2135367-4

(v) Debtor shall close the sale of all or substantially all of the Debtor's assets (the "Affiliation/Sale") on or before July 17, 2012.

All proceeds from the Affiliation/Sale shall be remitted (i) first, to satisfy, or otherwise provide for the satisfaction, in full of all Budgeted Professional Expenses incurred or accrued through the closing date of the Affiliation/Sale, *plus* up to $175,000 to pay the fees and expenses of the Debtor's professionals and up to $20,000 to pay the fees and expenses of Committee's professionals retained in the Chapter 11 Case accrued after the closing date of the Affiliation/Sale and allowed by a final order of the Court (with any unused portion to be applied pursuant to clauses (ii) – (iv) below), (ii) second, to repay the DIP Lender on account of any amounts owed under the DIP Loan Agreement; (iii) third, to the Master Trustee for application to the Bond Claim in accordance with the Bond Documents; and (iv) fourth, to the extent there are proceeds from the Affiliation/Sale remaining after the Bond Claim has been paid in full, subject to further order of the Court, to the Debtor.

16.    Termination of Use of Cash Collateral.

(a)    The Debtor's authority to use Cash Collateral pursuant to the terms of this Final Order will, subject to the Debtor's right to cure and further Court order as set forth in Paragraph 16(b) below, terminate without any further action by the Bankruptcy Court five (5) business days after written notification sent by the Master Trustee to the Debtor, the DIP Lender, the Committee, and the U.S. Trustee of the occurrence of any of the following (a "Termination Event"):

(i)    the failure of the Debtor to timely pay all fees due under 28 U.S.C. §1930;

(ii)    the Debtor's Chapter 11 case is dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code;

2135367-4

(iii)   the earlier of (y) the date of the entry of an order of this Court appointing a chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in Sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code); or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

(iv)   the closing of an Affiliation/Sale;

(v)   the occurrence of an Event of Default (as defined in the Final DIP Order);

(vi)   the Bankruptcy Court suspends the Debtor's bankruptcy case under Section 305 of the Bankruptcy Code;

(vii)   the Debtor fails to comply with, keep, observe or perform any of its agreements or undertakings under this Final Order;

(viii)   the Debtor's failure to meet any of the Sale Milestones;

(ix)   the Debtor's failure to be in compliance with the Budget subject to the variances set forth in the DIP Loan Agreement;

(x)   entry of an order confirming a plan in this bankruptcy case;

(xi)   this Final Order becomes stayed, reversed, vacated, amended, suspended or otherwise modified in any respect without the prior written consent of the Master Trustee;

(xii)   an adversary proceeding, contested matter or other action is commenced by the Debtor challenging the validity, extent, enforceability, priority or extent of the Master Trustee's liens or claims or otherwise seeking to impair the Master Trustee's position; or

(xiii)   imposition of orders, penalties or fines by any governmental agency or unit which does or could, if not cured promptly, result in the cessation of operations of the Debtor.

(b)   Unless during such five (5) business day period referenced above in Paragraph 16(a), the Debtor cures any Termination Event that is curable or the Debtor obtains an order by this Court, on notice to and with an opportunity to be heard by the Master Trustee and the Bank

(i) the Debtor's authority to use Cash Collateral hereunder shall automatically terminate and the Debtor shall be prohibited from continuing to use such Cash Collateral, (ii) the Master Trustee may exercise all rights and options set forth herein exercisable upon the occurrence of a default, and (iii) the Master Trustee, upon the expiration of such five business day period shall be automatically relieved of any further stay under Section 362 of the Bankruptcy Code, or other restriction on enforcement of its pre- and post-petition liens and security interests in the Prepetition Collateral and the Post-Petition Bond Collateral, all without further order of this Court.

17.    _Release and Waiver_.    Subject to the rights of the Committee pursuant to Paragraph 24 below, upon entry of this Final Order, the Debtor waives, releases and discharges the Secured Creditors and all holders of the Bonds, and their respective affiliates, agents, attorneys, participants, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Bonds and the Bond Documents, any aspect of the prepetition relationship between the Secured Creditors and/or the holders of the Bonds, and the Debtor, and any other prepetition acts or omissions by the Secured Creditors or holders of Bonds in connection with either the Bond Documents or such parties' prepetition relationship with Debtor. Further, pursuant to this Final Order, but subject to the rights of the Committee pursuant to Paragraph 24 below, the Debtor waives any and all rights to object to or contest to the amount of the Bond Claim or the amount, validity, extent, priority, perfection, or enforceability of the Master Trustee's Prepetition Liens on the Prepetition Collateral and agrees that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens, subject only to the

19

2135367-4

rights of residents in the Resident Deposits and the Permitted Encumbrances. This paragraph shall not have the effect of releasing Ziegler (as hereinafter defined) from any claims arising in connection in its role as underwriter of the Series 2006 Bonds.

18.    Failure of Adequate Protection. Nothing herein shall constitute a waiver, release or modification of the rights of the Master Trustee to assert a claim under sections 364(c).

19.    Deemed Request for Stay Relief. This Final Order shall be deemed to constitute a request by the Master Trustee for relief from the automatic stay with respect to the Prepetition Collateral as of the Petition Date and for adequate protection for the use of cash collateral as of the Petition Date.

20.    Carve Out. In consideration of Debtor's acknowledgement of the Prepetition Indebtedness and Debtor's waiver of any claims under section 506(c), and in exchange for the agreement that after the entry of this Final Order, Debtor, Debtor's professionals and other professionals retained in the Chapter 11 Case shall not seek any further reduction in, carve out from, or lien waivers with respect to the Prepetition Collateral or the Postpetition Bond Collateral, the Secured Creditors consent to the terms of the Carve Out, as hereinafter defined. For the purposes hereof, "Carve Out" shall mean:

(a)    to the extent that the engagement of B.C. Ziegler and Company ("Ziegler") as set forth in the Debtor's Application to Employ B.C. Ziegler and Company as the Debtor's Investment Banker and Financial Advisor [Dkt. 106] is approved by a final order of the Court (the "Ziegler Engagement Order"), (i) the minimum transaction fee of $200,000, to the extent due Ziegler pursuant to the Ziegler Engagement Order and (ii) the aggregate unpaid fees and expenses of Ziegler that are reimbursable pursuant to the Ziegler Engagement Order, up to a maximum amount of $40,000;

(b)    the aggregate unpaid fees and expenses of professionals retained in the Chapter 11 Case by the Debtor (other than ordinary course professionals and Ziegler) accrued on or before the earlier to occur of (1) five (5) business days

2135367-4

after written notice of the occurrence of a Termination Event is sent by the Master Trustee to the Debtor, the DIP Lender, the Committee and the U.S. Trustee unless the Court determines that no such Termination Event has occurred or such Termination Event is cured during such five (5) business day period and (2) the date on which the DIP Lender is entitled to take enforcement actions (other than the termination of commitments, the acceleration of the obligations under the DIP Loan Agreement or the sending of any notice in connection with an anticipated enforcement action) pursuant to the terms of the Final DIP Order and the DIP Loan Agreement (such earlier date, the "Termination Date"), and allowed by a final order of the Court (regardless of when allowed), up to the cumulative amount unpaid and remaining under the Budget through and including the Termination Date;

(c)     the unpaid fees and expenses of professionals retained in the Chapter 11 Case by any committee appointed in the Chapter 11 Case accrued on or before the Termination Date, and allowed by a final order of the Court (regardless of when allowed), up to the cumulative amount unpaid and remaining under the Budget through and including the Termination Date; provided, that the Committee reserves the right to request adjustments in the amount allocated to it in the Budget to the extent the Debtor pursues a restructuring through a plan separate and distinct from the process contemplated in Section 15 above (and all other parties reserve the right to object to any such adjustment request);

(d)     the aggregate fees, costs and expenses incurred by the Debtor after the Termination Date to transition residents to other facilities, to provide care to residents pending their respective transfer to other facilities and to perform activities related to the foregoing, up to a maximum amount of $250,000;

(e)     the aggregate unpaid fees and expenses of professionals retained in the Chapter 11 Case by the Debtor accrued after either the Termination Date or the closing date of an Affiliation/Sale to wind-down the Debtor's estate, in either case, up to a maximum amount of $175,000, and allowed by a final order of the Bankruptcy Court (regardless of when allowed)

(f)     the unpaid fees and expenses of professionals retained in the Chapter 11 Case by the Committee accrued after the Termination Date to wind-down the Debtor's estate up to a maximum amount of $20,000, and allowed by a final order of the Bankruptcy Court (regardless of when allowed);

(g)     the accrued and unpaid adequate protection payments in the amount set forth in the Budget;

2135367-4

(h)    all accrued and unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable, and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); and

(i)    reasonable fees and expense incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $50,000.

Except for the Carve Out, no costs or expenses of administration shall be imposed against the Secured Creditors or the Prepetition Collateral or the Post-Petition Bond Collateral under sections 105, 506(c) or 552(b) of the Bankruptcy Code or otherwise.

21.    Payment of Professional Fees from Collateral. The Debtor shall be permitted to pay compensation and reimbursement of expenses to professionals employed under section 327 or 1103 of the Bankruptcy Code, as the same may be due and payable, subject to the restrictions set forth herein (the "Budgeted Professional Expenses"). If, at any time (i) the Debtor has used the proceeds of the Prepetition Collateral or the Post-Petition Bond Collateral to pay Budgeted Professional Expenses, (ii) the Bond Claim has not been paid in full, (iii) all amounts owed to the DIP Lender under the DIP Loan Agreement have been paid in full, and (iv) the Debtor has funds that are neither proceeds of Prepetition Collateral nor otherwise subject to Post-Petition Bond Liens or Priming Liens (the "Available Funds"), then the Debtor shall, at its option, seek to disgorge such payment of Budgeted Professional Expenses or reimburse the Master Trustee from such Available Funds to the extent of such Budgeted Professional Expenses.

22.    Modification of Stay. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Master Trustee to take any action authorized or contemplated by this Final Order or the Bond Documents (as the same may be modified by this Final Order) and to carry out the terms thereof, including, without limitation the application, allocation or payment from any of the funds or

22

accounts maintained by the Master Trustee in accordance with the terms of the Bond Documents, including the Trustee Held Funds.  Any of the aforementioned actions may be taken without further order of this Court.

23.    <u>Preservation of Rights</u>.  If any or all of the provisions of this Final Order are, at any time, modified, vacated or stayed, such stay, modification or vacation shall not affect the validity, extent, priority and enforceability of any lien, priority, or other benefit conferred under this Final Order prior to such stay, modification or vacation.

24.    <u>Binding Effect</u>.  This Final Order shall be binding on all parties in this case, including, but not limited to, (w) the Debtor and any successors thereto, (x) pending entry of a final order, any Chapter 11 or Chapter 7 trustee that is appointed or elected in this case, (y) the Committee, or (z) any other party that may have standing to be heard; <u>provided</u>, <u>however</u>, that (a) this Final Order is without prejudice to the rights of the Committee to challenge the validity, amount, perfection, priority, extent or enforceability of the Bond Claim, the Bond Documents, the pre-petition security interests of the Master Trustee, or the rights of such Committee to, on behalf of such estate, assert any other claims or causes of action that have been otherwise released under Paragraph 17 of this Final Order (a "<u>Committee Claim</u>"), (b) any Committee Claim (i) may only be made and appropriately filed with this Court on or before March 5, 2012 (the "<u>Committee Deadline</u>") and (ii) may only be made if such Committee has acquired legal standing to assert such claims, and (c) not more than $15,000 of fees and expenses from Cash Collateral may be incurred by the Committee to investigate Committee Claims prior to the Committee Deadline.  Unless a Committee Claim is made in accordance with the procedural and time limitations set forth above, all such challenges shall be deemed finally and conclusively

2135367-4

barred and otherwise waived; and provided further that if a Committee Claim is timely made and properly filed, all potential claims and causes of actions are hereby deemed forever waived and relinquished by all parties including, but not limited to the party that filed such claim, except for those claims or causes of actions expressly asserted in accordance with this Paragraph 24. Furthermore, nothing in this Final Order shall amend, modify, impair or otherwise affect the Ground Lease or the Leasehold Mortgage or the rights of the Landlord under or in relation to the Ground Lease or the Leasehold Mortgage, and no summary, characterization or other description in this Final Order of the Ground Lease, the Leasehold Mortgage or the Leased Premises, or of the rights and obligations of the Debtor, the Landlord or the Master Trustee under or in relation to the Ground Lease, the Leasehold Mortgage or the Leased Premises, shall be binding upon the Landlord (or any of its affiliates, successors and/or assigns); provided, that the foregoing does not modify the rights of the DIP Lender under the Final DIP Order, the DIP Loan Agreement or the Lease Estoppel Agreement (as defined in the DIP Loan Agreement).

25.    No Competing Liens.  Except as set forth herein and the Final DIP Order, the Debtor shall not grant liens on, or security interests in, the Prepetition Collateral or the Post-Petition Bond Collateral to any other party, pursuant to section 364 of the Bankruptcy Code or otherwise.

26.    Further Relief.  Nothing herein shall prevent or preclude the Master Trustee or the Bank from (i) seeking any other relief that they may deem appropriate, including relief from the automatic stay, (ii) asserting at some later time that the Master Trustee's liens and security interests in the Prepetition Bond Collateral are not being adequately protected within the

24

meaning of section 361 of the Bankruptcy Code, or (iii) asserting their rights under the Bankruptcy Code, all of which are expressly preserved.

27.   <u>No Control</u>.  The Secured Creditors shall not be deemed by virtue of this Final Order to be in control of the operations of Debtor or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding its consent to this Final Order and extending financial accommodations of any type, kind or nature under this Final Order.

28.   <u>No Third Party Beneficiaries</u>.  No rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary, other than the DIP Lender.

29.   <u>Effectiveness; Notice of Stay Relief</u>. The rights and obligations of the parties under this Final Order shall be effective and enforceable as of the expiration date of the Third Interim Order.  This Final Order shall be deemed effective immediately and, for the avoidance of doubt, Federal Rule of Bankruptcy Procedure 6004(h) shall not apply hereto.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (i) the validity, extent, priority or enforceability of any obligations incurred prior to the actual receipt of written notice by the Master Trustee of the effective date of such reversal, modification, vacatur or stay or (ii) the validity, extent or enforceability of the liens and claims granted hereunder.

30.    Notices.    All notices, requests, demands, waivers and other communications required or permitted to be given under this Final Order shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or (c) sent by next-day or overnight mail or delivery.

(a)    If to Debtor to:

Clare Oaks
801 West Bartlett Road
Bartlett, Illinois 60103-4401
Attention: President
mike@chicagolegal.com

with a copy to:

Ungaretti & Harris LLP
Three First National Plaza
70 West Madison – Suite 3500
Chicago, IL 60602
Attn: George Mesires and Robert Drobnak
Email: grmesires@uhlaw.com; radrobnak@uhlaw.com

(b)    If to the Master Trustee to:

Wells Fargo Bank, National Association
MAC N9311-115
625 Minneapolis, MN 55479
Attention: Michael G. Slade
Email: Michael.G.Slade@wellsfargo.com

with a copy to:

Daniel S. Bleck, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Fax: 617-542-2241
Email: dsbleck@mintz.com

2135367-4

(c)     If to the Bank to:

Sovereign Bank
75 State Street, 4th Floor
Boston, Massachusetts  02109
Attention: Naomi O'Dell
Email: nodell@sovereignbank.com

with a copy to:

John R. Weiss
Duane Morris LLP
190 North LaSalle Street, Suite 3700
Chicago, IL  60603-3433
Email: jrweiss@duanemorris.com

(d)     If to the DIP Lender:

Senior Care Development, LLC
500 Mamaroneck Avenue, Suite 406
Harrison, New York 10528
Attn:  David Reis
Email:  dreis@seniorcaredevelopment.com

with a copy to:

William S. Fish, Jr.
Sarah M. Lombard
Hinckley, Allen & Snyder LLP
20 Church Street
Hartford, Connecticut 06103
Email: wfish@haslaw.com; slombard@haslaw.com

(e)     If to the Committee:

Neal Wolf & Associates, LLC
155 N. Wacker Drive, Suite 1910
Chicago, IL  60606
Attn:  Neal Wolf and Dean C. Gramlich
Email:  nwolf@nealwolfaw.com dgramlich@nealwolflaw.com

27

DATED:  March __, 2012    MAR 0 8 2012

_____
United States Bankruptcy Judge

2135367-4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11 B 48903 |
| | ) | |
| CLARE OAKS, | ) | Hon. Pamela S. Hollis |
| | ) | Chapter 11 |
| Debtor. | ) | |

**EXHIBIT A**

**Budget**

Subject to F.R.E. 408

**DIP Budget**
Not-For-Profit
($ in Thousands)

Clare Oaks

**DIP Budget**
for Clare Oaks
($000s Omitted)

| Week of Case | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | 3/2/2012 | 3/9/2012 | 3/16/2012 | 3/23/2012 | 3/30/2012 | 4/6/2012 | 4/13/2012 | 4/20/2012 | 4/27/2012 | 5/4/2012 | 5/11/2012 | 5/18/2012 | 5/25/2012 | 6/1/2012 |
| **Clare Oaks (Not-For-Profit) - Cash Flow** | | | | | | | | | | | | | | |
| Beginning Book Cash Balance | $ 2,445 | $ 2,563 | $ 2,272 | $ 1,921 | $ 1,567 | $ 1,389 | $ 1,166 | $ 1,220 | $ 1,068 | $ 1,159 | $ 1,131 | $ 1,153 | $ 996 | $ 1,134 |
| **Receipts** | | | | | | | | | | | | | | |
| ILU | 34 | 135 | 135 | 34 | - | 34 | 135 | 135 | 34 | 34 | 135 | 102 | 34 | 34 |
| ALF/MS | 8 | 64 | 67 | 35 | - | 8 | 64 | 67 | 35 | 8 | 48 | 67 | 35 | 17 |
| SNF | 288 | 43 | 103 | 218 | 279 | 150 | 48 | 266 | 155 | 100 | - | 110 | 402 | 85 |
| Co-Insurance | - | - | 80 | 80 | - | - | - | 89 | 89 | - | 46 | 86 | 86 | - |
| Other | - | - | 14 | 5 | - | - | 15 | 5 | - | 15 | 15 | 5 | - | - |
| **Total Receipts** | 330 | 243 | 399 | 372 | 279 | 192 | 263 | 562 | 313 | 142 | 244 | 369 | 556 | 136 |
| *Disbursements - Operating* | | | | | | | | | | | | | | |
| Payroll | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 |
| Trade Payables Current | 187 | 197 | 197 | 197 | 187 | 183 | 183 | 183 | 183 | 197 | 197 | 197 | 187 | 197 |
| Entrance Fee Refunds | - | - | - | 200 | - | - | - | 200 | - | - | - | - | - | - |
| Capital Expenditures | 15 | 15 | 15 | 15 | 260 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Other Expenses | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Total Operating Disbursements | 212 | 527 | 222 | 727 | 457 | 513 | 208 | 713 | 208 | 527 | 222 | 527 | 418 | 527 |
| **Net Operating Cash Flow** | 118 | (284) | 177 | (354) | (177) | (321) | 54 | (152) | 104 | (386) | 22 | (157) | 139 | (391) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | |
| Professional Fees | - | - | 468 | - | - | 395 | - | - | - | 384 | - | - | - | 352 |
| US Trustee Fees | - | - | - | - | - | - | - | - | 13 | - | - | - | - | - |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | - | 8 | 60 | - | - | 8 | - | - | - | 10 | - | - | - | 14 |
| **Total Restructuring Disbursements** | - | 8 | 528 | - | - | 403 | - | - | 13 | 394 | - | - | - | 366 |
| *Financing Disbursements* | | | | | | | | | | | | | | |
| DIP Funding | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Total Financing Disbursements** | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Net Cash Flow** | 118 | (291) | (351) | (354) | (177) | (224) | 54 | (152) | 91 | (29) | 22 | (157) | 139 | (7) |
| **Ending Book Cash Balance** | $ 2,563 | $ 2,272 | $ 1,921 | $ 1,667 | $ 1,389 | $ 1,166 | $ 1,220 | $ 1,068 | $ 1,159 | $ 1,131 | $ 1,153 | $ 996 | $ 1,134 | $ 1,128 |
| Beginning DIP Balance | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,750 | $ 2,750 | $ 2,750 | $ 2,750 |
| DIP Funding | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Ending DIP Balance** | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,750 | $ 2,750 | $ 2,750 | $ 2,750 | $ 3,500 |

Subject to F.R.E. 408

**DIP Budget**
Not-For-Profit          Clare Oaks
($ in Thousands)

DIP Budget
for Clare Oaks
($000s Omitted)

| Week of Case | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 22 Weeks Total |
|---|---|---|---|---|---|---|---|---|---|
| | Week Ended | Week Ended | Week Ended | Week Ended | Week Ended | Week Ended | Week Ended | Week Ended | 3/2/2012 |
| | 6/8/2012 | 6/15/2012 | 6/22/2012 | 6/29/2012 | 7/6/2012 | 7/13/2012 | 7/20/2012 | 7/27/2012 | 7/27/2012 |
| **Clare Oaks (Not-For-Profit) – Cash Flow** | | | | | | | | | |
| Beginning Book Cash Balance | $ 1,128 | $ 1,054 | $ 1,380 | $ 1,540 | $ 973 | $ 1,026 | $ 1,251 | $ 1,412 | $ 2,445 |
| **Receipts** | | | | | | | | | |
| ILU | 34 | 135 | 102 | 34 | 34 | 135 | 102 | 34 | 1,624 |
| ALF/MS | 8 | 48 | 67 | 35 | 17 | 48 | 67 | 35 | 849 |
| SNF | 100 | 48 | 114 | 418 | 238 | 48 | 114 | 318 | 3,692 |
| Co-Insurance | - | - | - | 89 | - | - | 89 | 89 | 865 |
| Other | - | 15 | 5 | - | - | 15 | 5 | - | 97 |
| **Total Receipts** | 142 | 246 | 376 | 576 | 289 | 246 | 376 | 476 | 7,128 |
| **Disbursements - Operating** | | | | | | | | | |
| Payroll | - | 305 | - | 305 | - | 305 | - | 305 | 3,355 |
| Trade Payables Current | 191 | 191 | 191 | 197 | 191 | 191 | 191 | 191 | 4,202 |
| Entrance Fee Refunds | - | - | - | 266 | - | - | - | - | 872 |
| Capital Expenditures | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 575 |
| Other Expenses | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 220 |
| **Total Operating Disbursements** | 216 | 521 | 216 | 793 | 216 | 521 | 216 | 521 | 9,224 |
| **Net Operating Cash Flow** | (74) | (275) | 161 | (217) | 73 | (275) | 161 | (45) | (2,097) |
| **Restructuring Disbursements** | | | | | | | | | |
| Professional Fees | - | - | - | 350 | - | - | - | 336 | 2,285 |
| US Trustee Fees | - | - | - | - | - | - | - | 13 | 26 |
| Utility Deposits | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | - | - | - | - | 21 | - | - | 23 | 142 |
| **Total Restructuring Disbursements** | - | - | - | 350 | 21 | - | - | 372 | 2,453 |
| **Financing Disbursements** | | | | | | | | | |
| DIP Funding | - | 600 | - | - | - | 500 | - | - | 3,100 |
| **Total Financing Disbursements** | - | 600 | - | - | - | 500 | - | - | 3,100 |
| **Net Cash Flow** | (74) | 325 | 161 | (567) | 53 | 225 | 161 | (417) | (1,450) |
| **Ending Book Cash Balance** | $ 1,054 | $ 1,380 | $ 1,540 | $ 973 | $ 1,026 | $ 1,251 | $ 1,412 | $ 995 | $ 995 |
| Beginning DIP Balance | $ 3,500 | $ 3,500 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,600 | $ 4,600 | $ 1,500 |
| DIP Funding | - | 600 | - | - | - | 500 | - | - | 3,100 |
| **Ending DIP Balance** | $ 3,500 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,600 | $ 4,600 | $ 4,600 | $ 4,600 |

Privileged Confidential

DIP Budget
for Clare Oaks
($000s Omitted)

**Estimated Total Professional Fees for Clare Oaks**

| ($ in Thousands) | December | January | February | March | April | May | June | July | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Clare Oaks** | | | | | | | | | |
| *Financial Advisors:* | | | | | | | | | |
| Alvarez & Marsal | 100 | 100 | 90 | 90 | 80 | 70 | 70 | 70 | 670 |
| Ziegler (1) | - | 20 | 10 | 10 | - | - | - | - | 40 |
| **Total FA** | 100 | 120 | 100 | 100 | 80 | 70 | 70 | 70 | 710 |
| *Legal Advisors:* | | | | | | | | | |
| Ungaretti & Harris | 175 | 175 | 175 | 150 | 150 | 150 | 125 | 125 | 1,225 |
| Jones Day (Bond Counsel) | - | - | - | - | 10 | 5 | 5 | 5 | 25 |
| **Total Legal** | 175 | 175 | 175 | 150 | 160 | 155 | 130 | 130 | 1,250 |
| Claims Agent | 20 | 15 | 10 | 10 | 10 | 10 | 10 | 10 | 95 |
| **Total Clare Oaks** | 295 | 310 | 285 | 260 | 250 | 235 | 210 | 210 | 2,055 |
| *Other:* | | | | | | | | | |
| Adequate Protection (Creditors) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 800 |
| Unsecured Committee (2) | 10 | 30 | 45 | 30 | 40 | 40 | 40 | 40 | 275 |
| Ombudsman | - | - | - | - | - | - | - | - | - |
| **Grand Total** | 405 | 440 | 430 | 390 | 390 | 375 | 350 | 350 | 3,130 |

Notes: (1) Fees will be paid at closing
Notes: (2) Includes an extra $15k placeholder in February relating to committee claims, not specified to a specific month

**Estimated Professional Fees PAID Net of Holdback**

| | December | January | February | March | April | May | June | July | Total | Holdback |
|---|---|---|---|---|---|---|---|---|---|---|
| **Clare Oaks** | | | | | | | | | | |
| *Financial Advisors* | | | | | | | | | | |
| Alvarez & Marsal | - | - | 100 | 100 | 90 | 90 | 80 | 70 | 530 | 140 |
| Ziegler (1) | - | - | - | 16 | 8 | 8 | - | - | 32 | 8 |
| **Total FA** | - | - | 100 | 116 | 98 | 98 | 80 | 70 | 562 | 148 |
| *Legal Advisors* | | | | | | | | | | |
| Ungaretti & Harris | - | - | 140 | 140 | 140 | 120 | 120 | 120 | 780 | 445 |
| Jones Day (Bond Counsel) | - | - | - | - | - | 8 | 8 | 4 | 12 | 13 |
| **Total Legal** | - | - | 140 | 140 | 140 | 120 | 128 | 124 | 792 | 458 |
| Claims Agent | - | - | 20 | 15 | 10 | 10 | 10 | 10 | 75 | 20 |
| **Total Clare Oaks** | - | - | 260 | 271 | 248 | 228 | 218 | 204 | 1,429 | 626 |
| *Other* | | | | | | | | | | |
| Adequate Protection (Creditors) | - | - | 200 | 100 | 100 | 100 | 100 | 100 | 700 | 100 |
| Unsecured Committee (2) | - | - | 8 | 24 | 36 | 24 | 32 | 32 | 156 | 119 |
| Ombudsman | - | - | - | - | - | - | - | - | - | - |
| **Grand Total** | - | - | 468 | 395 | 384 | 352 | 350 | 336 | 2,285 | 845 |

Privileged & Confidential

Subject to F.R.E. 408