## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Clare Oaks, | ) | Case No. 11 B 48903 |
| | ) | |
| Debtor. | ) | Honorable Pamela S. Hollis |
| | ) | |
| | ) | |

## FINAL ORDER (I) AUTHORIZING DEBTOR
## TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED
## SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364,
## AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion"), dated December 13, 2011, of Clare Oaks (the "Debtor"), as debtor and debtor in possession, in the above-captioned case (the "Chapter 11 Case") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Illinois (the "Local Bankruptcy Rules"), seeking, among other things, entry of an interim order (as entered by the Court on December 23, 2011 [Dkt. No. 82], the "First Interim Order"), a second interim order (as entered by the Court on February 2, 2012 [Dkt. No. 144], the "Second Interim Order", and together with the First Interim Order, the "Interim DIP Orders") and a final order (this "Final Order"):

2129775-7

(i)        authorizing the Debtor to obtain postpetition financing (the "Financing")
in the form of a multiple draw term loan made available to the Debtor in a principal
amount of up to $6,000,000 (the "Facility") with superpriority claims and first priority
priming liens senior to any prepetition or postpetition liens (subject to the conditions
herein), pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code from
Senior Care Development, LLC or its designee (the "DIP Lender"); provided, however,
that as part of the agreement between the Debtor and the Secured Parties (as hereinafter
defined) regarding this Final Order and the Final Cash Collateral Order (as hereinafter
defined), the Debtor shall not request any advances under the Facility in excess of
$5,600,000 (the "Financing Cap") without the Secured Creditors' prior written consent,
which consent shall not be implied from any action or inaction by the Secured Creditors;

(ii)        authorizing the Debtor to execute and deliver final documentation
substantially in the form of the Senior Secured Super-Priority Debtor-in-Possession Loan
Agreement (attached to the First Interim Order as Exhibit A, as amended from time to
time in accordance with the terms thereof, the Second Interim Order and this Final Order,
including the amendment attached to the Second Interim Order as Exhibit A and the
amendment attached to this Final Order as Exhibit A (such amendment, the "Second
Amendment"), the "DIP Credit Agreement")[1] and any other document requested by the
DIP Lender (subject to the review and consent of the Secured Creditors (as hereinafter
defined), which shall not be unreasonably withheld or delayed) in connection with the
Financing pursuant to the DIP Credit Agreement including, without limitation, security
agreements, pledge agreements, mortgages, leasehold mortgages, financing statements,

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the DIP Credit Agreement.

deeds of trust and other security documents (along with the DIP Credit Agreement and all

of the forgoing whenever executed, collectively, the "DIP Documents");

   (iii)  scheduling a final hearing pursuant to Bankruptcy Rules 4001(b), (c) and

(d); and

   (iv)  granting related relief;

the Court having considered the Motion, having examined the exhibits attached thereto, and

having completed the First Interim Hearing (defined below) and Second Interim Hearing

(defined below) and the Final Hearing (defined below) as provided for under section 364 of the

Bankruptcy Code, Bankruptcy Rule 4001(c), and applicable Local Bankruptcy Rules, and

finding the Debtor provided notice as set forth below to all necessary parties and that no further

notice is required:

**BASED UPON THE RECORD ESTABLISHED AT THE FIRST INTERIM HEARING, SECOND INTERIM HEARING AND FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

  A.  **Petition Date.** Commencing on December 5, 2011 (the "Petition Date"), the

Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court" or this "Court").

The Debtor has continued in the management and operation of its business and property as

debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in the Chapter 11 Case.

  B.  **Jurisdiction.** This Court has core jurisdiction over the Chapter 11 Case, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of

the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

C.   **Notice**. Due and appropriate notice of the Motion, the relief requested therein and the Final Hearing having been served by the Debtor on: (i) the Office of the United States Trustee for the Northern District of Illinois; (ii) the Debtor's 20 largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Lender; (iv) counsel to Wells Fargo Bank, National Association, as master trustee under that certain Master Trust Indenture dated as of July 1, 2006 and as mortgagee under the Leasehold Mortgage and Security Agreement dated as of July 1, 2006 (the "Master Trustee") with respect to certain bonds (collectively, the "Series 2006 Bonds") issued for the benefit of the Debtor by the Illinois Finance Authority (the "Authority") pursuant to two separate Bond Trust Indentures between the Authority and Wells Fargo Bank, National Association, as Bond Trustee (the "Bond Trustee"), each dated as of July 1, 2006, (v) counsel to Sovereign Bank (the "Bank"; and together with the Bond Trustee and the Master Trustee, the "Secured Creditors"), the issuer of certain letters of credit backing certain of the Series 2006 Bonds, (vi) counsel to The Sisters of St. Joseph of the Third Order of St. Francis, Inc. (the "Landlord") and (vii) any other known lienholder as of the Petition Date whose liens are being primed under the Financing in compliance with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules.

D.   **Opportunity to be Heard**. Pursuant to Bankruptcy Rule 4001, an interim hearing (the "First Interim Hearing") on the Motion was held before this Court to consider entry of the First Interim Order on December 15, 2011, a second hearing (the "Second Interim Hearing") on the Motion was held before this Court to consider entry of the Second Interim

Order on January 24, 2012, and a final hearing (the "Final Hearing") on the Motion was held before this Court to consider entry of the Final Order on March 6, 2012.

E.     **Disposition.**  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled are hereby denied and overruled.

F.     **Lender's Protections**.  The DIP Lender is willing to lend money and provide other financial accommodations to the Debtor only on the terms and conditions and with the protections provided herein and in the DIP Documents and is relying on such terms, conditions, and protections in agreeing to lend money and provide financial accommodations to the Debtor hereunder.

G.     **Immediate Entry of the Order**.  The Debtor has requested that this Final Order become immediately effective and enforceable upon entry, notwithstanding any provisions that may apply in Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure.  The Debtor has demonstrated good cause for the entry of this Final Order and for this Final Order to become immediately effective and enforceable upon entry.  Among other things, entry of this Final Order and the immediate effectiveness and enforceability of this Final Order upon entry will minimize the disruption of the Debtor's business operations and permit the Debtor to satisfy its operating expenses, and is in the best interests of the Debtor and the Debtor's bankruptcy estate.  The terms of the borrowings and other financial accommodations authorized hereby are fair and reasonable under the circumstances and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

H.      **Findings Regarding the Financing**.

(i)      Good cause has been shown for the entry of this Final Order;

(ii)      The Debtor has an immediate need to obtain the Financing, to the extent set forth in the Budget (as defined in the DIP Credit Agreement and attached hereto as <u>Exhibit B</u>, as it may be amended from time to time pursuant to the terms of the DIP Credit Agreement), to (a) fund the postpetition operating expenses of the Debtor incurred in the ordinary course of business, (b) pay interest, fees and expenses in connection with the Financing to the DIP Lender in accordance with the DIP Documents, (c) make adequate protection payments to the Master Trustee or its designee and (d) pay certain other costs and expenses of administration of the Chapter 11 Case.  The access of the Debtor to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor and to a successful reorganization of the Debtor;

(iii)      The Debtor currently is unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Because of the liens on the Debtor's property held by the Secured Creditors securing their claims (the "<u>Prepetition Liens</u>") there exists no equity in such property and therefore the Debtor is unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set

forth in the DIP Documents without the Debtor granting to the DIP Lender, subject to the Carve Out (as defined below), the DIP Liens (as defined below) and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Final Order and in the DIP Documents;

(iv)    The terms of the Financing are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties;

(v)    The Financing has been negotiated in good faith and at arm's length among the Debtor and the DIP Lender, and all of the Debtor's obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, all loans pursuant to the DIP Documents, and any other expenses or obligations under the DIP Documents (all of the foregoing collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise;

(vi)    The Secured Creditors have consented to the relief requested herein and in the Final Order Regarding Use of Cash Collateral and Adequate Protection (the "Final Cash Collateral Order", and together with the Interim Order

(1) Authorizing Use of Cash Collateral and (2) Providing Adequate Protection entered on December 19, 2011, the Second Interim Order Regarding Use of Cash Collateral and Adequate Protection entered on December 22, 2011, and the Third Interim Cash Collateral Order Regarding Use of Cash Collateral and Adequate Protection entered on January 30, 2012, the "Cash Collateral Orders"), including the first priority position of the DIP Liens;

 (vii) The Landlord has consented to the relief requested herein;

 (viii) The Official Unsecured Creditors' Committee of Clare Oaks ("Committee") has consented to the relief requested herein;

 (ix) Entering into the Financing and the DIP Documents reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties; and

 (x) The Debtor has requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by this Final Order, the Debtor's estate will be immediately and irreparably harmed. Consummation of the Financing in accordance with this Final Order and the DIP Documents is therefore in the best interests of the Debtor's estate consistent with its fiduciary duties.

### ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. **Authorization of the Financing and DIP Documents.**

 (i) The Debtor is hereby authorized to execute and enter into the DIP Documents — on a final basis and to the extent consistent with the terms of this Final Order and the DIP Documents — and incorporated herein by reference,

including, without limitation the execution, delivery and performance of the DIP Credit Agreement, any notes, security and pledge agreements, mortgages contemplated thereby and the other agreements referred to as and in the DIP Documents;

(ii)    The Debtor is hereby authorized to execute, deliver and perform one or more amendments, waivers, consents or other modifications to and under the DIP Documents not inconsistent with the terms of this Final Order by filing notice of such amendment, waiver, consent or other modification with this Court. Following the filing of such notice, any party in interest may contest such amendment, waiver, consent or other modification by filing a motion (an "Amendment Challenge") with this Court within five business days of being provided notice of such amendment, waiver, consent or other modification. Subject to the convenience of this Court's calendar, a hearing on any Amendment Challenge shall be held within five business days of the date that the Amendment Challenge is filed.  If an Amendment Challenge is not timely filed and served, or if the relief sought in the Amendment Challenge is denied, the amendment, waiver, consent or other modification shall become immediately effective.

(iii)    The Debtor is hereby authorized to borrow money pursuant to the DIP Documents, and the Debtor is hereby authorized to incur indebtedness up to an aggregate principal amount of $6,000,000 (including the commitment fee described in Section 4.8(a) of the DIP Credit Agreement earned and paid upon the entry of the First Interim Order and the amendment fee described in the Second Amendment earned and paid upon the entry of this Final Order), subject to the

Financing Cap, which borrowings shall be used only as permitted under the DIP

Documents and in accordance with the Budget, subject to the variance permitted

by the DIP Documents, or as otherwise approved in writing by the DIP Lender

and the Secured Creditors, and to enter into any and all other and further

agreements and arrangements in connection therewith and to pay interest and

expenses and incur DIP Obligations all in accordance with this Final Order and

the DIP Documents, including, without limitation, the nonrefundable payment to

the DIP Lender of the fees referred to in the DIP Documents and reasonable costs

and expenses as may be due from time-to-time, specifically including, without

limitation, fees and expenses of the professionals retained by the DIP Lender

provided for in the DIP Documents, subject to the limitations contained therein

and herein. Concurrently with the DIP Lender's provision of an invoice to the

Debtor with respect to any fees, costs, charges and reasonable out-of-pocket

expenses incurred by the DIP Lender payable by Debtor under the DIP Credit

Agreement, the DIP Lender will provide an invoice to the United States Trustee.

Absent any objection filed with the Bankruptcy Court within five (5) business

days of receipt of such invoice, the DIP Lender may apply funds in the Expense

Reimbursement Reserve to the payment or reimbursement for such fees, costs,

charges and expenses. In the event that an objection is timely filed with the

Bankruptcy Court, the DIP Lender shall not apply funds in the Expense

Reimbursement Reserve to the payment or reimbursement of all amounts subject

to such objection until resolution of such objection by agreement of the DIP

Lender and the Debtor or United States Trustee, as applicable, or by further Court

order. For the avoidance of doubt, the fees and expenses included in such invoice shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code. Any invoice contemplated herein may be redacted with respect to privileged matters; provided, however, that the Debtor may not incur indebtedness in an aggregate principal amount in excess of the Financing Cap without the Secured Creditors' prior written consent, which consent shall not be implied from any action or inaction by the Secured Creditors, or pursuant to a further order of the Court. The fees and expenses of professionals retained in the Chapter 11 Case by the Debtor or the Committee shall be subject to the provisions of Section 5 of this Order.

(iv)    The Debtor shall furnish the Budget to the DIP Lender and the Secured Creditors in accordance with the terms of the DIP Documents and the Final Cash Collateral Order.  Approval or disapproval of any Budget shall be governed by the terms of the DIP Credit Agreement and the Final Cash Collateral Order. The Court hereby expressly approves and authorizes the Debtor to reserve or escrow any Advance drawn in respect of all accrued and unpaid fees and expenses of such professionals to the extent Debtor reasonably believes such amounts will be required to be paid and are provided for by the terms of the Budget at the time of such Advance.

(v)    In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to, subject to the terms of this Final Order, perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security

agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtor's performance of its obligations under the Financing and under the DIP Documents.

2.   **Valid, Binding, Non-Avoidable Obligations**.   Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute and represent valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their terms and subject to the terms of this Final Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of the Chapter 11 Case. No obligation, payment, right, transfer or grant of security or lien under the DIP Credit Agreement, the other DIP Documents, this Final Order or the Interim DIP Orders shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.   **Superpriority Claims**.

(i)   Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations approved under this Final DIP Order and the Interim DIP Orders shall constitute allowed senior administrative expense claims against the Debtor (the "Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever,

including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all DIP Collateral (as hereinafter defined), subject only to the payment (or to provide for the payment) of the Carve Out.

(ii)     The DIP Lender shall have the right to credit bid up to the entire amount of the DIP Obligations and/or bid in excess of the amount of the DIP Obligations, if necessary, in any sale of DIP Collateral (which, for the avoidance of doubt, does not include the fee interest in the Land Premises or Existing Improvements) or in connection with any plan of reorganization and shall have standing with respect to any such sale or plan of reorganization or hearing related thereto.

(iii)    The Superpriority Claim shall expressly include all of the DIP Lender's fees (including reasonable legal fees), costs, charges and reasonable out-of-pocket expenses associated with (a) the preparation and negotiation of the DIP Documents, the Interim DIP Orders and this Final Order, (b) the consummation of the transactions described in the DIP Documents, the Interim DIP Orders and this Final Order, (c) administration of the Financing, and (d) the enforcement of rights and remedies set forth in the DIP Documents, the Interim DIP Orders and this Final Order, that have been billed to or incurred by DIP Lender, subject to the limitations in the DIP Credit Agreement and Section 1(iii) of this Final Order; provided, however, the Superpriority Claim shall not include any of the DIP Lender's fees to the extent they are incurred in or related to the DIP Lender's role as a bidder or potential bidder for the Debtor's assets or in connection with any

sale of the Debtor's assets to the extent the DIP Lender is acting in a role other than in its capacity as a DIP Lender. The Lender shall be entitled to charge the Debtor's account or receive reimbursement thereof, from the Expense Reimbursement Reserve or otherwise, in each case as a Superpriority Claim, pursuant to Section 4.8(c) of the DIP Credit Agreement without application to the Court.

4.     **DIP Liens**. As security for the DIP Obligations, effective and perfected upon the date of, and through, the Interim DIP Orders and continuing thereafter through this Final Order and without the necessity of the execution, recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral (defined below), the DIP Lender shall have the DIP Liens (as defined below) on the DIP Collateral, subject to the payment (or to provide for the payment) of the Carve Out:

(a)     DIP Collateral.  The DIP Lender shall have DIP Liens on all assets (tangible, intangible, real, personal and mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, cash and cash equivalents, rights in deposit accounts, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests (including the Debtor's leasehold estate in the Tenant's Leasehold Estate (as defined in the Lease, as hereinafter defined)), contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, subject only to the Carve Out (collectively, all of the foregoing is defined herein as the "DIP Collateral"). For the avoidance of doubt, the DIP Collateral

shall also include (i) all resident processing fees, entrance fees, if any, and option

deposits pursuant to the residency and care agreements (or other applicable agreements)

for the continuing care retirement community in Bartlett, Illinois known as "Clare Oaks"

received by Debtor after the Petition Date, plus the deposits and entrance fees in the

approximate amount of $907,100 as of the Petition Date held in escrow accounts with

The Chicago Trust Company, N.A., a Wintrust Wealth Management Company

(collectively, the "Resident Deposits"), whether existing or new, and (ii) all other

accounts of Borrower, and all proceeds and products of all of the foregoing.

Notwithstanding the foregoing or any other terms of this Order or any DIP Document, the

DIP Collateral shall not include (a) any account or the deposit therein as of the Petition

Date which are held or controlled by the Master Trustee or any Bond Trustee pursuant to

the terms of the documents evidencing and securing the Series 2006 Bonds (all such

funds, the "Trustee Held Funds"), and (b) claims and causes of action that arise as of or

subsequent to the Petition Date under chapter 5 of the Bankruptcy Code and the proceeds

thereof and property received thereby whether by judgment, settlement or otherwise

(collectively, "Avoidance Actions").  For the avoidance of doubt, the DIP Collateral shall

not include the fee interest in the Land Premises or Existing Improvements.

(b)     First Priority Priming Lien on Prepetition and Postpetition Collateral.  The

obligations owing to the DIP Lender under the Facility shall be secured by a perfected

security interest in, and lien on, the DIP Collateral (collectively, the "DIP Liens"), subject

to the Carve-Out (as defined below), as follows:  (i) pursuant to section 364(c)(2) of the

Bankruptcy Code, perfected, first priority non-avoidable senior liens on all DIP Collateral

that is not otherwise subject to valid, perfected and non-avoidable liens as of the Petition

Date; (ii) other than with respect to the liens described in clause (iii) below, which liens shall be primed by the liens described in such clause, pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected second priority junior lien on all DIP Collateral that is otherwise subject to (x) valid, perfected and non-avoidable liens approved by the DIP Lender as of the Petition Date or (y) valid liens in existence at the Petition Date and approved by the DIP Lender and that are perfected subsequent to the Petition Date and as permitted by section 546(b) of the Bankruptcy Code and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code, all as set forth on Exhibit E to the DIP Credit Agreement (the liens described in the preceding sub-clauses (x) and (y), the "Permitted Encumbrances"); and (iii) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien on the DIP Collateral senior and superior to all Liens (other than the Permitted Encumbrances) including without limitation the Prepetition Liens and any Liens granted pursuant to the Cash Collateral Orders. Notwithstanding anything herein, the DIP Liens shall be subordinate to (i) the Carve Out, but, for the avoidance of doubt, payment (or providing for the payment) of the Carve Out shall not reduce the amounts payable to the DIP Lender hereunder or under the DIP Documents, and (ii) the prior rights of residents to the Resident Deposits pursuant to the applicable escrow agreement or any order authorizing the Debtor to escrow or segregate any Resident Deposits for the benefit of the residents. Without limiting the forgoing, the DIP Lender has a mortgage upon the Debtor's leasehold estate in the Tenant's Leasehold Estate (as such term is defined in that certain Ground Lease between the Landlord, as landlord, and Debtor, as tenant, dated as of July 1, 2006, as in effect as of the Petition Date and as amended or supplemented after the Petition Date with the consent of DIP

Lender, the Master Trustee and the Bank (the "Lease")) to secure the repayment of the

Facility that is senior and superior to all Liens upon such leasehold estate including

without limitation the Secured Creditors' mortgage upon such leasehold estate.

5.    **Carve Out**.   The carve out for certain expenses and professional fees incurred

during the pendency of the Chapter 11 Case (the "Carve Out") means:

(a)    (i) the minimum transaction fee of $200,000, to the extent due B.C. Ziegler
and Company ("Ziegler") pursuant to the Order Authorizing Debtor to
Employ B.C. Ziegler and Company as the Debtor's Investment Banker and
Financial Advisor [Dkt. 161] (the "Ziegler Engagement Order"), and (ii) the
aggregate unpaid fees and expenses of Ziegler that are reimbursable pursuant
to the Ziegler Engagement Order, up to a maximum amount of $40,000;

(b)    the aggregate unpaid fees and expenses of professionals retained in the
Chapter 11 Case by the Debtor (other than ordinary course professionals and
Ziegler) accrued on or before the earlier to occur of (1) five (5) business days
after written notice of the occurrence of a Termination Event (as defined in
the Final Cash Collateral Order) is sent by the Master Trustee to the Debtor,
the DIP Lender, the Committee and the U.S. Trustee unless the Court
determines that no such Termination Event has occurred or such Termination
Event is cured during such five (5) business day period and (2) the date on
which the DIP Lender is entitled to take enforcement actions (other than the
termination of commitments, the acceleration of the DIP Obligations or the
sending of any notice in connection with an anticipated enforcement action)
pursuant to the terms of this Final Order and the DIP Loan Agreement (such
earlier date, the "Termination Date"), and allowed by a final order of the
Court (regardless of when allowed), up to the cumulative amount unpaid and
remaining under the Budget through and including the Termination Date;

(c)    the unpaid fees and expenses of professionals retained in the Chapter 11 Case by
any committee appointed in the Chapter 11 Case accrued on or before the
Termination Date, and allowed by a final order of the Court (regardless of when
allowed), up to the cumulative amount unpaid and remaining under the Budget
through and including the Termination Date; provided, that the Committee
reserves the right to request adjustments in the amount allocated to it in the
Budget to the extent the Debtor pursues a restructuring through a plan separate
and distinct from the process contemplated in Section 8.2(o) of the DIP Credit
Agreement (and all other parties reserve the right to object to any such adjustment
request);

(d)    the aggregate fees, costs and expenses incurred by the Debtor after the
Termination Date to transition residents to other facilities, to provide care to

2129775-7                                   17

residents pending their respective transfer to other facilities and to perform activities related to the foregoing, up to a maximum amount of $250,000;

(e)     the aggregate unpaid fees and expenses of professionals retained in the Chapter 11 Case by the Debtor accrued after either the Termination Date or the closing date of a sale of all or substantially all of the Debtor's assets to wind-down the Debtor's estate, in either case, up to a maximum amount of $175,000, and allowed by a final order of the Bankruptcy Court (regardless of when allowed);

(f)     the unpaid fees and expenses of professionals retained in the Chapter 11 Case by the Committee accrued after the Termination Date to wind-down the Debtor's estate up to a maximum amount of $20,000, and allowed by a final order of the Bankruptcy Court;

(g)     the accrued and unpaid adequate protection payments in the amount set forth in the Budget;

(h)     all accrued and unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable, and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); and

(i)     reasonable fees and expense incurred by a trustee under 726(b) of the Bankruptcy Code not to exceed $50,000;

provided, however, that any sums advanced to the Debtor under and pursuant to the DIP Credit Agreement to fund the fees, expenses and payments identified in clauses (a) – (i) of the definition of "Carve Out" shall be deemed paid and satisfied for purposes of calculating the amount of the Carve Out. For the avoidance of doubt, notwithstanding anything else to the contrary in the DIP Documents, the DIP Lender shall not be obligated to lend more than $6,000,000 after entry of this Final Order. As provided in Section 13 of this Order, in no event shall any portion of the DIP Financing or proceeds thereof be used to pay the fees, costs or expenses of any person in connection with a challenge of a DIP Lien or any other action adverse to the rights or interests of the DIP Lender.

6.    **Protection of DIP Lender's Rights**.

(a)    None of the DIP Collateral shall be subject to any liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents, the Interim DIP Orders or this Final Order; and

(b)    On five (5) business days after notice to the Debtor, the Master Trustee, the Bank, the United States Trustee, the Landlord and the Committee, upon the occurrence and continuation of an event of default under the DIP Documents (an "Event of Default"), the automatic stay provisions of section 362 of the Bankruptcy Code will be deemed vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies under the DIP Documents absent an order of this Court to the contrary.  Subject to the payment provisions described below, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or otherwise.  The delay or failure to exercise rights and remedies under the DIP Documents, the Interim DIP Orders or this Final Order by the DIP Lender shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.  The Debtor waives and shall not be entitled to any right of setoff against the DIP Lender relating to the DIP Obligations.

8.    **Limitation on Charging Expenses Against Collateral**.  So long as, and to the extent that, any DIP Obligations remain outstanding, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or

2129775-7                                              19

recovered from the DIP Collateral pursuant to sections 105, 506(c) and 552(b) of the Bankruptcy Code without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action or inaction by the DIP Lender.

9.    **Financial Reporting**.    The Debtor shall provide the DIP Lender with financial and other reporting as described in the DIP Documents.

10.    **Perfection of DIP Liens**.

(a)    The Debtor and the DIP Lender are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to the DIP Lender hereunder; provided, however, the Debtor shall perform any act in furtherance thereof if reasonably requested by the DIP Lender. Whether the DIP Lender, in its sole discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and from the date of entry of the First Interim Order forward. Upon the request of the DIP Lender, without any further consent of any party, the DIP Lender and the Debtor are each authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Lender to validate, perfect, preserve and enforce the DIP Liens. By the First Interim Order, which shall serve as evidence of perfection, the DIP Lender shall be

deemed to have executed all such agreements, financing statements, instruments and other documents as may reasonably be requested to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens;

(b)    A copy of either Interim DIP Order or this Final Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such copy of such Interim DIP Order or this Final Order for filing and recording; and

(c)    To the extent allowed under applicable law, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code; provided, however, that this Section 9(c) does not apply to the Lease. Any such provision or any other provision inconsistent with the terms of this Final Order shall have no force and effect with respect to the transactions granting postpetition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Documents or this Final Order.

11.    **Indemnification**.

Debtor shall indemnify and hold harmless DIP Lender and its affiliates, officers, directors, employees, agents, advisors, attorneys and representatives (each, an "Indemnified

Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Credit Agreement, the other DIP Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the Facility, whether or not such investigation, litigation or proceeding is brought by Debtor, any of its shareholders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or thereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Debtor or any of its shareholders or creditors for or in connection with the transactions contemplated hereby or thereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages. The indemnification obligation on the part of Debtor shall survive the payment of the DIP Obligations, the termination of the Commitment and any cancellation of the DIP Credit Agreement. Without limitation of the foregoing, Debtor shall pay, and hold each Indemnified Party harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection

with arranging the financing contemplated hereby.    For the avoidance of doubt, the

indemnification obligations set forth herein shall not apply to the extent that the DIP Lender is

acting in a role other than in its capacity as a Lender under the DIP Credit Agreement.

12.    **Preservation of Rights Granted Under the Order**.

(a)    No claim or lien having a priority superior to or pari passu with

those granted by the Interim DIP Orders and this Final DIP Order to the DIP

Lender shall be granted or allowed while any portion of the Financing or the

commitments thereunder (including repayment of the Carve-Out) or the DIP

Obligations remain outstanding, and the DIP Liens shall not be (i) subject or

junior to any lien or security interest that is avoided and preserved for the benefit

of the Debtor's estate under section 551 of the Bankruptcy Code or (ii)

subordinated to or made pari passu with any other lien or security interest,

whether under section 364(d) of the Bankruptcy Code or otherwise;

(b)    Unless all DIP Obligations shall have indefeasibly been paid in

cash in full, the Debtor shall not seek, and others shall not seek, and it shall

constitute an Event of Default, if there is, (i) any modification or extension of this

Final Order without the prior written consent of the DIP Lender, and no such

consent shall be implied by any other action, inaction or acquiescence, (ii) an

order converting or dismissing the Chapter 11 Case or (iii) if Debtor seeks to

obtain financing from any other source on either a pari passu or priority basis;

(c)    If an order dismissing the Chapter 11 Case under section 1112 of

the Bankruptcy Code or otherwise is at any time entered, such order shall provide

(in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the

Superpriority Claims and DIP Liens granted to the DIP Lender pursuant to the Interim DIP Orders and this Final Order shall continue in full force and effect and shall maintain their priorities as provided in the Interim DIP Orders and this Final Order until all DIP Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims and DIP Liens, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above;

(d)     To the extent of applicable law, if any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations and DIP Liens incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations.  Notwithstanding any such reversal, stay, modification or vacation, DIP Obligations incurred by the Debtor prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and pursuant to the DIP Documents with respect to all uses of DIP Obligations; and

2129775-7                                           24

(e)     Except as expressly provided in this Final Order or in the DIP

Documents, the DIP Liens and the Superpriority Claims granted by the provisions

of the Interim DIP Orders, this Final Order and the DIP Documents shall survive,

and shall not be modified, impaired or discharged by (i) the entry of an order

converting the Chapter 11 Case to a case under chapter 7, dismissing the Chapter

11 Case, or by any other act or omission or (ii) the entry of an order confirming a

plan of reorganization (or a plan of liquidation) in the Chapter 11 Case and,

pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived

any discharge as to any remaining DIP Obligations.  The terms and provisions of

the Interim DIP Orders, this Final Order and the DIP Documents shall continue in

this Chapter 11 Case, in any successor case, or in any superseding chapter 7 case

under the Bankruptcy Code, the DIP Liens, the Superpriority Claims and all other

rights and remedies of the DIP Lender granted by the provisions of the Interim

DIP Orders, this Final Order and the DIP Documents shall continue in full force

and effect until the DIP Obligations are indefeasibly paid in cash in full.

13.     **Limitation on Use of Financing Proceeds and Collateral**.  Notwithstanding

anything herein or in any other order by this Court to the contrary (other than the rights of the

Committee set forth in paragraphs 17 and 24 of the Cash Collateral Orders with respect to parties

other than the DIP Lender), no DIP Collateral, portion of the proceeds of the Financing or part of

the Carve Out may be used for any of the following (each, a "Lender Dispute") without the prior

written consent of the DIP Lender or the Secured Creditors (as applicable): (a) to investigate,

litigate, object, contest or raise any defense to the validity, perfection, priority, extent or

enforceability of any amount due under any DIP Document, or the Bond Documents (as defined

in the Final Cash Collateral Order) or the liens or claims granted under the Interim DIP Orders, this Final Order, any DIP Document, or the Cash Collateral Orders, (b) to assert any claim or cause of action against the DIP Lender, the Secured Creditors, or their respective agents, affiliates, representatives, attorneys or advisors with respect to the DIP Documents, the Financing, the Bond Documents, or the Bond Claim (as defined in the Final Cash Collateral Order), (c) to prevent, hinder or otherwise delay the DIP Lender's or Secured Creditors' assertion, enforcement or realization on the DIP Collateral or the Collateral (as defined in the Final Cash Collateral Order) in accordance with the DIP Documents, the Interim DIP Orders, this Final Order, the Bond Documents or the Cash Collateral Orders, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the DIP Lender, the Secured Creditors, or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Financing, the DIP Documents, the Bond Documents, or the Bond Claim, or (e) to seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Documents; provided, however, that a Lender Dispute shall not include (i) the prosecution of the Motion and the Debtor's Emergency Motion for the Entry of an Interim Order: (I) Authorizing Use of Cash Collateral; (II) Providing Adequate Protection; and (III) Scheduling a Final Hearing, including without limitation the seeking of this Final Order and the Final Cash Collateral Order, (ii) responding to any notice of an Event of Default or notice of a Termination Event (as defined in the Final Cash Collateral Order), including without limitation seeking, appearing at, and fully participating in an emergency hearing, and (iii) actions taken after the Termination Date or the closing date of the sale of all or substantially all of the Debtor's assets to wind-down the Debtor's estate, up to the aggregate dollar amounts permitted under

the Carve Out, including without limitation, those incurred to protect the health and safety of residents, to preserve and protect the value of the DIP Collateral, to respond to any governmental subpoena, citation or other regulatory action or to complete the process of converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. This provision shall be binding on any subsequently appointed or elected trustee or examiner, if any.

14.     **Enforcement of Remedies**.

(a)     Upon the occurrence of the Maturity Date under the DIP Documents, the DIP Obligations shall become immediately due and owing. Absent an order of this Court to the contrary, in the absence of full payment in cash of all of the DIP Obligations when due, as provided for in this paragraph, the automatic stay is hereby deemed vacated as provided in this Final Order on the fifth business day after such payment becomes due (subject to the notice requirements in Section 6(c) above), and the DIP Lender shall thereafter be permitted to exercise such rights and remedies under such agreements, documents, and applicable law as to all or such part of the DIP Collateral as the DIP Lender shall, in its sole discretion, elect, including, but not limited to, the DIP Lender's right to foreclose on the leasehold mortgages and seek to take possession of any cash of the Debtor that is DIP Collateral.

(b)     Upon an Event of Default of any of the DIP Obligations, as applicable, the Default Rate set forth in the DIP Documents shall immediately be applicable.

15.   **Effect of Stipulations on Third Parties**.

    (a)    This Final Order and the DIP Credit Agreement shall be binding upon the Debtor and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all DIP Lender Claims as of the date of entry of this Final Order; and

    (b)    Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtor or its estate.

16.   **Order Governs.**  In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

17.   **Binding Effect; Successors and Assigns.**  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Lender, the Bank, the Landlord, the Master Trustee, the Bond Trustees and their respective bondholders, the Committee, and the Debtor and of the respective successors and assigns of the foregoing (including, with respect to the Debtor, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Lender and its respective successors and assigns, provided, however, that the DIP Lender shall have no obligation to permit the use of DIP Collateral or to extend any financing or permit the

use of cash collateral to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor except to the extent permitted by the Carve-Out.  By virtue of this Final Order and the DIP Credit Agreement, and in determining to make any loan under the DIP Credit Agreement, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtor, (ii) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate or (iii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.,* as amended, or any similar federal or state statute).

18.    **Effectiveness**.    This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

19.    **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

Dated: Chicago, Illinois    MAR 0 8 2012
~~February~~ ~~, 2012~~ .

_____
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                          )     Case No. 11 B 48903
                                                )
CLARE OAKS,                                     )     Hon. Pamela S. Hollis
                                                )     Chapter 11
                        Debtor.                 )

## EXHIBIT A

**Second Amendment to DIP Credit Agreement**

## SECOND AMENDMENT TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

**THIS SECOND AMENDMENT TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "**Amendment**") is entered into as of the 8th day of March, 2012, by and between **CLARE OAKS**, an Illinois not-for-profit corporation, as Borrower, Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("**Borrower**") and **SENIOR CARE DEVELOPMENT, LLC**, a Delaware limited liability company, together with its successors and assigns ("**Lender**").

### WITNESSETH

**WHEREAS,** pursuant to the terms of that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of December 22, 2011 (as amended by that certain First Amendment to Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of February 2, 2012 and as may be further amended, restated, supplemented or otherwise modified from time to time, the "**Agreement**"), the Lender has agreed to make loans to the Borrower;

**WHEREAS,** pursuant to the terms of the Agreement, the Borrower is to comply with certain milestones regarding the sale of all or substantially all of its assets;

**WHEREAS,** the Borrower has requested that the Lender extend the date by which it must satisfy one of the sales milestones by one month; and

**WHEREAS,** the Lender is willing to amend the Agreement as requested in accordance with the terms hereof.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

§1.    Definitions. Capitalized terms used herein without definition that are defined in the Agreement shall have the same meanings herein as therein.

§2.    Ratification of Existing Agreements. All of the Borrower's obligations and liabilities to the Lender as evidenced by or otherwise arising under the Agreement and the Loan Documents (collectively, the "**Financing Documents**"), except as otherwise expressly modified in this Amendment upon the terms set forth herein, are, by Borrower's execution of this Amendment, ratified and confirmed in all respects. In addition, by Borrower's execution of this Amendment, Borrower represents and warrants that no counterclaim, right of set-off, right of recoupment, or defense of any kind exists or is outstanding with respect to such obligations and liabilities. Borrower acknowledges and agrees that this Amendment shall be included in the definition of Loan Documents under the Agreement.

2130603-1

§3.    Representations and Warranties. Borrower hereby represents and warrants to the Lender as follows:

(a)    All of the representations and warranties made by the Borrower in the Agreement and the other Financing Documents are true and correct in all material respects on the date hereof as if made on and as of the date hereof, except to the extent that any of such representations and warranties relate by their terms to a prior date and for matters previously disclosed to the Lender in writing.

(b)    No Default or Event of Default under and as defined in the Agreement or any of the Financing Documents has occurred and is continuing on the date hereof.

§4.    Conditions Precedent. The effectiveness of the amendments contemplated hereby shall be subject to the satisfaction on or before the date hereof of each of the following conditions precedent:

(a)    Representations and Warranties. All of the representations and warranties made by the Borrower herein, whether directly or incorporated by reference, shall be true and correct on the date hereof.

(b)    Performance; No Event of Default. The Borrower shall have performed and complied in all material respects with all terms and conditions herein required to be performed or complied with by them prior to or at the time hereof, and there shall exist no Default or Event of Default or condition which, with either or both the giving of notice or the lapse of time, would result in a Default or an Event of Default upon the execution and delivery of this Amendment.

(c)    Amendment. The Lender shall have received this Amendment, duly executed by the Borrower.

(d)    Proceedings and Documents. All proceedings in connection with the transactions contemplated by this Amendment shall be satisfactory in substance and form to the Lender, and the Lender shall have received all information and such counterpart originals or certified or other copies of such documents as it may request.

(e)    Amendment Fee. Lender's receipt of an amendment fee in an amount equal to Sixty Thousand Dollars ($60,000).

§5.    Amendment to the Agreement. Subject to the satisfaction of the conditions precedent set forth in §4, effective as of the date hereof the Agreement is hereby amended as follows:

(a)    Amendment to Section 4.8(c). Section 4.8(c) is hereby amended by deleting the last sentence thereof and inserting the following therefor: "Lender shall deliver to Borrower and the U.S. Trustee invoices for all its fees, costs, charges and reasonable out-of-pocket expenses payable by Borrower hereunder. Absent any objection filed with the

2120603-1

2

Bankruptcy Court by the U.S. Trustee within five (5) Business Days of receipt of such invoice, Lender may apply funds in the Expense Reimbursement Reserve to the payment or reimbursement for such fees, costs, charges and expenses."

(b)     Amendment to Section 8.2(o)(iii).   Section 8.2(o)(iii) is hereby amended by deleting the date "March 6, 2012" and inserting "April 6, 2012" in its place.

§6.   Miscellaneous.

(a)     This Amendment shall be governed by and construed in accordance with the laws of the State of Illinois.

(b)     Except as otherwise expressly provided by this Amendment, all of the respective terms, conditions and provisions of the Agreement shall remain the same. It is declared and agreed by each of the parties hereto that the Agreement, as amended hereby, shall continue in full force and effect, and that this Amendment and the Agreement be read and construed as one instrument, and all references in the Financing Documents to the Agreement shall hereafter refer to the Agreement, as amended by this Amendment.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. A facsimile or other electronic transmission of an executed counterpart shall have the same effect as the original executed counterpart.

*[Signatures on next page]*

2120603-1

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed in its name and behalf by its duly authorized officer, as applicable, as of the date first written above.

BORROWER:
CLARE OAKS

By: _____
Name:    Paul Rundell
Title:    Chief Restructuring Officer

LENDER:
SENIOR CARE DEVELOPMENT, LLC

By: _____
Name:    ~~David Reis~~ Brett Mehlman
An Authorized Person

[Signature page to Second Amendment to Senior Secured Super-Priority Debtor-In-Possession Loan Agreement]

4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11 B 48903 |
| | ) | |
| CLARE OAKS, | ) | Hon. Pamela S. Hollis |
| | ) | Chapter 11 |
| Debtor. | ) | |

**EXHIBIT B**

**Budget**

Subject to F.R.E. 408

**DIP Budget**
Not-For-Profit   Clare Oaks
($ in Thousands)

**DIP Budget**
**for Clare Oaks**
**($000s Omitted)**

| Week of Case | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | 3/2/2012 | 3/9/2012 | 3/16/2012 | 3/23/2012 | 3/30/2012 | 4/6/2012 | 4/13/2012 | 4/20/2012 | 4/27/2012 | 5/4/2012 | 5/11/2012 | 5/18/2012 | 5/25/2012 | 6/1/2012 |
| **Clare Oaks (Not-For-Profit) – Cash Flow** | | | | | | | | | | | | | | |
| Beginning Book Cash Balance | $ 2,445 | $ 2,563 | $ 2,272 | $ 1,921 | $ 1,567 | $ 1,389 | $ 1,166 | $ 1,220 | $ 1,068 | $ 1,159 | $ 1,131 | $ 1,153 | $ 996 | $ 1,134 |
| **Receipts** | | | | | | | | | | | | | | |
| ILU | 34 | 135 | 135 | 34 | - | 34 | 135 | 135 | 34 | 34 | 135 | 102 | 34 | 34 |
| ALF/MS | 8 | 64 | 67 | 35 | 34 | 8 | 64 | 67 | 35 | 8 | 48 | 67 | 35 | 17 |
| SNF | 288 | 43 | 103 | 218 | 279 | 150 | 48 | 266 | 155 | 100 | 48 | 110 | 402 | 85 |
| Co-Insurance | - | - | 80 | 80 | - | - | 15 | 89 | 89 | - | 15 | 46 | 86 | - |
| Other | - | - | 14 | 5 | 5 | - | 15 | 5 | - | - | 15 | 86 | 5 | - |
| **Total Receipts** | 330 | 243 | 399 | 372 | 279 | 192 | 263 | 562 | 313 | 142 | 244 | 369 | 556 | 136 |
| *Disbursements - Operating* | | | | | | | | | | | | | | |
| Payroll | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 | - | 305 |
| Trade Payables Current | 187 | 197 | 197 | 197 | 187 | 183 | 183 | 183 | 183 | 197 | 197 | 197 | 187 | 197 |
| Entrance Fee Refunds | - | - | - | 200 | 260 | - | - | 200 | - | - | - | - | 206 | - |
| Capital Expenditures | 15 | 15 | 15 | 15 | - | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Other Expenses | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Total Operating Disbursements | 212 | 527 | 222 | 727 | 457 | 513 | 208 | 713 | 208 | 527 | 222 | 527 | 418 | 527 |
| **Net Operating Cash Flow** | 118 | (284) | 177 | (354) | (177) | (321) | 54 | (152) | 104 | (385) | 22 | (157) | 139 | (391) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | |
| Professional Fees | - | - | 468 | - | - | 395 | - | - | - | 384 | - | - | - | 352 |
| US Trustee Fees | - | - | - | - | - | - | - | - | 13 | - | - | - | - | - |
| Utility Deposits | - | - | 60 | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | - | 8 | - | - | - | 8 | - | - | - | 10 | - | - | - | 14 |
| **Total Restructuring Disbursements** | - | 8 | 528 | - | - | 403 | - | - | 13 | 394 | - | - | - | 366 |
| *Financing Disbursements* | | | | | | | | | | | | | | |
| DIP Funding | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Total Financing Disbursements** | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Net Cash Flow** | 118 | (291) | (351) | (354) | (177) | (224) | 54 | (152) | 91 | (29) | 22 | (157) | 139 | (7) |
| **Ending Book Cash Balance** | $ 2,563 | $ 2,272 | $ 1,921 | $ 1,567 | $ 1,389 | $ 1,166 | $ 1,220 | $ 1,068 | $ 1,159 | $ 1,131 | $ 1,153 | $ 996 | $ 1,134 | $ 1,128 |
| Beginning DIP Balance | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,750 | $ 2,750 | $ 2,750 | $ 2,750 |
| DIP Funding | - | - | - | - | - | 500 | - | - | - | 750 | - | - | - | 750 |
| **Ending DIP Balance** | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,750 | $ 2,750 | $ 2,750 | $ 2,750 | $ 3,500 |

Privileged Confidential

Subject to F.R.E. 408

**DIP Budget**
Not-For-Profit      Clare Oaks
($ in Thousands)

DIP Budget
for Clare Oaks
($000s Omitted)

| Week of Case | 27 Week Ended 6/8/2012 | 28 Week Ended 6/15/2012 | 29 Week Ended 6/22/2012 | 30 Week Ended 6/29/2012 | 31 Week Ended 7/6/2012 | 32 Week Ended 7/13/2012 | 33 Week Ended 7/20/2012 | 34 Week Ended 7/27/2012 | 22 Weeks Total 3/2/2012 7/27/2012 |
|---|---|---|---|---|---|---|---|---|---|
| **Clare Oaks (Not-For-Profit) – Cash Flow** | | | | | | | | | |
| Beginning Book Cash Balance | $ 1,128 | $ 1,054 | $ 1,380 | $ 1,540 | $ 973 | $ 1,026 | $ 1,251 | $ 1,412 | $ 2,445 |
| **Receipts** | | | | | | | | | |
| ILU | 34 | 135 | 102 | 34 | 34 | 135 | 102 | 34 | 1,624 |
| ALFMS | 8 | 48 | 67 | 35 | 17 | 48 | 67 | 35 | 849 |
| SNF | 100 | 48 | 114 | 418 | 238 | 48 | 114 | 318 | 3,692 |
| Co-Insurance | - | - | 89 | 89 | - | - | 89 | 89 | 865 |
| Other | - | 15 | 5 | - | - | 15 | 5 | - | 97 |
| **Total Receipts** | 142 | 246 | 376 | 576 | 289 | 246 | 376 | 476 | 7,128 |
| *Disbursements – Operating* | | | | | | | | | |
| Payroll | - | 305 | - | 305 | - | 305 | - | 305 | 3,355 |
| Trade Payables Current | 191 | 191 | 191 | 197 | 191 | 191 | 191 | 191 | 4,202 |
| Entrance Fee Refunds | - | - | - | 266 | - | - | - | - | 872 |
| Capital Expenditures | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 575 |
| Other Expenses | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 220 |
| Total Operating Disbursements | 216 | 521 | 216 | 793 | 216 | 521 | 216 | 521 | 9,224 |
| **Net Operating Cash Flow** | (74) | (276) | 161 | (217) | 73 | (276) | 161 | (45) | (2,097) |
| *Restructuring Disbursements* | | | | | | | | | |
| Professional Fees | - | - | - | 350 | - | - | - | 336 | 2,285 |
| US Trustee Fees | - | - | - | - | - | - | - | 13 | 26 |
| Utility Deposits | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | - | - | - | - | 21 | - | - | 23 | 142 |
| **Total Restructuring Disbursements** | - | - | - | 350 | 21 | - | - | 372 | 2,463 |
| *Financing Disbursements* | | | | | | | | | |
| DIP Funding | - | 600 | - | - | - | 500 | - | - | 3,100 |
| **Total Financing Disbursements** | - | 600 | - | - | - | 500 | - | - | 3,100 |
| Net Cash Flow | $ (74) | $ 325 | $ 161 | $ (567) | $ 53 | $ 225 | $ 161 | $ (417) | $ (1,450) |
| Ending Book Cash Balance | $ 1,054 | $ 1,380 | $ 1,540 | $ 973 | $ 1,026 | $ 1,251 | $ 1,412 | $ 995 | $ 995 |
| Beginning DIP Balance | $ 3,500 | $ 3,500 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,600 | $ 4,600 | $ 1,500 |
| DIP Funding | - | 600 | - | - | - | 500 | - | - | 3,100 |
| Ending DIP Balance | $ 3,500 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,100 | $ 4,600 | $ 4,600 | $ 4,600 | $ 4,600 |

Privileged Confidential

Subject to F.R.E. 408

DIP Budget
for Clare Oaks
($000s Omitted)

**Estimated Total Professional Fees for Clare Oaks**

($ in Thousands)

| Clare Oaks | December | January | February | March | April | May | June | July | Total |
|---|---|---|---|---|---|---|---|---|---|
| *Financial Advisors:* | | | | | | | | | |
| Alvarez & Marsal | 100 | 100 | 90 | 90 | 80 | 70 | 70 | 70 | 670 |
| Ziegler (1) | | 20 | 10 | 10 | | | | | 40 |
| **Total FA** | **100** | **120** | **100** | **100** | **80** | **70** | **70** | **70** | **710** |
| *Legal Advisors:* | | | | | | | | | |
| Ungaretti & Harris | 175 | 175 | 175 | 150 | 150 | 150 | 125 | 125 | 1,225 |
| Jones Day (Bond Counsel) | | | | | 10 | 5 | 5 | 5 | 25 |
| **Total Legal** | **175** | **175** | **175** | **150** | **160** | **155** | **130** | **130** | **1,250** |
| Claims Agent | 20 | 15 | 10 | 10 | 10 | 10 | 10 | 10 | 95 |
| **Total Clare Oaks** | **295** | **310** | **285** | **260** | **250** | **235** | **210** | **210** | **2,055** |
| *Other:* | | | | | | | | | |
| Adequate Protection (Creditors) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 800 |
| Unsecured Committee (2) | 10 | 30 | 45 | 30 | 40 | 40 | 40 | 40 | 275 |
| Ombudsman | | | | | | | | | |
| **Grand Total** | **405** | **440** | **430** | **390** | **390** | **375** | **350** | **350** | **3,130** |

Notes: (1) Fees will be paid at closing
Notes: (2) Includes an extra $15K placeholder in February relating to committee claims, not specified to a specific month

**Estimated Professional Fees PAID Net of Holdback**

| Clare Oaks | December | January | February | March | April | May | June | July | Total | Holdback |
|---|---|---|---|---|---|---|---|---|---|---|
| *Financial Advisors* | | | | | | | | | | |
| Alvarez & Marsal | | | 100 | 100 | 90 | 90 | 80 | 70 | 530 | 140 |
| Ziegler (1) | | | | 16 | 8 | 8 | | | 32 | 8 |
| **Total FA** | | | **100** | **116** | **98** | **98** | **80** | **70** | **562** | **148** |
| *Legal Advisors* | | | | | | | | | | |
| Ungaretti & Harris | | | 140 | 140 | 140 | 120 | 120 | 120 | 780 | 445 |
| Jones Day (Bond Counsel) | | | | | | | 8 | 4 | 12 | 13 |
| **Total Legal** | | | **140** | **140** | **140** | **120** | **128** | **124** | **792** | **458** |
| Claims Agent | | | 20 | 15 | 10 | 10 | 10 | 10 | 75 | 20 |
| **Total Clare Oaks** | | | **260** | **271** | **248** | **228** | **218** | **204** | **1,429** | **626** |
| *Other* | | | | | | | | | | |
| Adequate Protection (Creditors) | | | 200 | 100 | 100 | 100 | 100 | 100 | 700 | 100 |
| Unsecured Committee (2) | | | 8 | 24 | 36 | 24 | 32 | 32 | 156 | 119 |
| Ombudsman | | | | | | | | | | |
| **Grand Total** | | | **468** | **395** | **384** | **352** | **350** | **336** | **2,285** | **845** |

Privileged & Confidential